# EXHIBIT 1

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

Execution Copy

## BOUXTIE INC.
## NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (this "*Agreement*"), dated as of 13th of October 2017, is entered into by and among BOUXTIE INC., a Delaware corporation (the "*Company*"), and each of the undersigned purchasers (collectively the "*Purchasers*" and individually a "*Purchaser*") listed on the Schedule of Purchasers attached hereto as <u>Exhibit A</u>.

### RECITALS

On the terms and subject to the conditions set forth herein, each Purchaser is willing to purchase from the Company and the Company is willing to sell to each Purchaser, an unsecured convertible promissory note in the principal amount set forth opposite such Purchaser's name on <u>Exhibit A</u>.

Certain other capitalized terms not defined herein shall have the meanings set forth in the form of Note (as defined below) attached hereto as <u>Exhibit B</u>.

### AGREEMENT

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.          <u>The Notes</u>.

(a)          <u>Issuance of Notes</u>.  Subject to the terms and conditions of this Agreement, the Company agrees to issue, sell and deliver to each Purchaser, and each Purchaser severally agrees to purchase, an unsecured convertible promissory note in the form of <u>Exhibit B</u> attached hereto (each, a "*Note*" and, collectively, the "*Notes*") in the principal amount set forth opposite the respective Purchaser's name on <u>Exhibit A</u> hereto.

(b)          <u>Purchase Price</u>.  The purchase price payable by each Purchaser for each Note issuable hereunder (the "*Purchase Price*") is set forth opposite the name of each Purchaser on <u>Exhibit A</u>.

(c)          <u>Use of Proceeds</u>.  The Company will use the proceeds from the sale of the Notes for general corporate purposes.

2.          <u>Closing; Delivery</u>.

(a)          <u>Initial Closing</u>.  The first closing of the sale and purchase of the Notes (the "*Initial Closing*") shall take place electronically on the date first set forth above or such later date as shall be mutually acceptable to the Company and the Purchasers.

(b)          <u>Subsequent Closings</u>.  Subject to the terms and conditions of this Agreement, the Company may sell Notes at an additional closing or closings on or prior to the date that is thirty (30) days from the date hereof to such persons as the Company may determine (each

**EXHIBIT   |**

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

a "*Subsequent Purchaser*"). Any such sale shall be made on the same terms and conditions as those contained herein, and each Subsequent Purchaser shall (i) become a party to this Agreement and (ii) have the rights and obligations of a Purchaser hereunder. The closing for the sale of Notes to such Subsequent Purchasers shall be referred to as an "*Additional Closing*." Each closing may be referred to as a Closing and collectively as the "*Closings*."

(c)     Delivery.   At each Closing, on the terms and subject to the conditions hereof, each Purchaser shall pay to the Company, by check or wire transfer of immediately available funds, such Purchaser's Purchase Price, and, in exchange for and upon receipt or confirmation of such payment, the Company will issue and deliver to each Purchaser a Note in the principal amount indicated on Exhibit A hereto.

3.     Representations and Warranties of the Company.   The Company hereby represents and warrants to each Purchaser that:

(a)     Organization and Standing: Articles and Bylaws.   The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to be so qualified would have a material adverse effect on its business or properties (a "*Material Adverse Effect*").

(b)     Corporate Power.   The Company has all requisite legal and corporate power and authority to own and operate its properties and assets, to enter into, execute and deliver this Agreement and the Notes, to issue and sell the Securities (as defined below), and to carry out the provisions of this Agreement, the Notes and the Company's Certificate of Incorporation, as amended to date, filed with the Delaware Secretary of State (the "*Charter*"). This Agreement and the Notes are valid and binding obligations of the Company, enforceable in accordance with their terms, except as the same may be limited by bankruptcy, insolvency, moratorium, and other laws of general application affecting the enforcement of creditors' rights and governing specific performance, injunctive relief or other equitable remedies and general principles of equity.

(c)     Authorization.

(1)     All corporate and legal action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Notes, the sale and issuance of the Notes and the performance of the Company's obligations hereunder and under the Notes, including the issuance and delivery of the Notes and the reservation of shares of Financing Stock issuable upon conversion of the Notes, have been taken or will be taken prior to the Closing. The shares of the Company's Financing Stock issuable upon conversion of the Notes in connection with a conversion pursuant to Section 5 of the Notes (the "*Conversion Transaction*") will be reserved for issuance upon the closing of the Conversion Transaction.

(2)     The Notes, any shares of Financing Stock issuable upon conversion or exercise of the Notes, any shares of Common Stock issuable upon conversion or exercise of the Notes, and any shares of Common Stock issuable upon conversion of such Financing Stock

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

(collectively, the "*Securities*"), when issued, sold and delivered in compliance with the provisions of this Agreement, the Notes or the terms of such Financing Stock, will be validly issued, fully paid and nonassessable and will be free of any liens or encumbrances, provided, however, that the Securities may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein, and as may be required by future changes in such laws. The issuance of the Securities will not violate or be subject to any preemptive rights, rights of first refusal and similar rights other than those that have been complied with or waived, and the Securities will be issued in compliance with all applicable federal and state securities laws.

(d)     <u>Rights of Capital Stock</u>. The rights, preferences, privileges and restrictions of the Company's capital stock are as stated in the Charter. The shares of the Financing Stock issuable upon conversion of the Notes will be reserved for issuance upon the closing of a Conversion Transaction. When issued in compliance with the provisions of this Agreement, the Notes, and the Charter, such Financing Stock and Common Stock will be validly issued, fully paid and nonassessable, and will be free of any liens or encumbrances other than those created by or imposed upon the Purchasers; provided, however, that such Financing Stock and Common Stock may be subject to restrictions on transfer as set forth herein and under state and/or federal securities laws or as otherwise required by such laws at the time a transfer is proposed.

(e)     <u>Government Consent, Etc</u>. No consent, approval, order or authorization of, or designation, registration, declaration or filing with, any federal, state, local or provincial or other governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement and the Notes, or the offer, sale or issuance of the Securities, or the consummation of any other transaction contemplated hereby or thereby other than (i) the filing of the Charter, and (ii) if required, filings or qualifications under U.S. federal securities laws, applicable blue sky laws or other applicable securities laws, which filings or qualifications, if required, will be timely filed or obtained by the Company.

(f)     <u>Compliance with Laws and Other Instruments; No Conflicts</u>. The Company is not (a) in violation or default of any material provisions of its Certificate of Incorporation or Bylaws, as amended to date, (b), to its knowledge, in violation or default of any applicable laws, regulations, judgments, decrees or orders of the United States of America or any state, foreign country or other governmental body or agency having jurisdiction over the Company's business or properties or (c) in breach of or default under or, to its knowledge, alleged to be in breach of or default under, any material lease, license, contract, agreement, Debt Security, instrument or obligation to which it is a party or its properties are subject, other than, in each of (b) and (c) that would not reasonably be expected to have a material adverse effect on the business, property, financial condition or results of operations of the Company. The execution, delivery and performance of the Agreement and the Note on the part of the Company, will not result in any such violation or default.

(g)     <u>Offering</u>. Assuming the accuracy of the representations and warranties of the Purchasers contained in <u>Section 4</u> hereof and subject to filings pursuant to Regulation D of the Securities Act, as amended (the "*Securities Act*") and applicable state securities laws, the offer, issue, and sale of the Securities are and will be exempt from the registration and prospectus delivery requirements of the Securities Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

all applicable state securities laws. Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell all or any part of the Securities to any person or persons so as to bring the sale of such Securities by the Company within the registration provisions of the Securities Act or any state securities laws.

(h)     No "Bad Actor" Disqualification. The Company has exercised reasonable care, in accordance with Security Exchange Commission rules and guidance, and has conducted a factual inquiry, including by the procurement of relevant questionnaires from each Covered Person (as defined below) or other means, the nature and scope of which reflect reasonable care under the relevant facts and circumstances, to determine whether any Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act ("*Disqualification Events*"). To the Company's knowledge, no Covered Person is subject to a Disqualification Event, except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act. The Company has complied, to the extent applicable, with any disclosure obligations under Rule 506(e) under the Securities Act. "*Covered Persons*" are those persons specified in Rule 506(d)(1) under the Securities Act, including the Company; any predecessor or affiliate of the Company; any director, executive officer, other officer participating in the offering, general partner or managing member of the Company; any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power; any promoter (as defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of the sale of the Notes; and any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of the Notes (a "*Solicitor*"), any general partner or managing member of any Solicitor, and any director, executive officer or other officer participating in the offering of any Solicitor or general partner or managing member of any Solicitor.

4.     Representations and Warranties by the Purchasers. Each Purchaser represents and warrants to the Company, severally and not jointly and as to itself only, as follows:

(a)     Investment Intent: Authority. This Agreement is made with such Purchaser in reliance upon such Purchaser's representation to the Company, evidenced by such Purchaser's execution of this Agreement, that such Purchaser is acquiring the Notes for investment for such Purchaser's own account, not as nominee or agent, for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act, or applicable state securities laws. Such Purchaser has the full right, power, authority and capacity to enter into and perform this Agreement and the Agreement constitutes a valid and binding obligation of such Purchaser, except as the same may be limited by bankruptcy, insolvency, moratorium, and other laws of general application affecting the enforcement of creditors' rights and general principles of equity.

(b)     Securities Not Registered. Such Purchaser understands and acknowledges that the offering of the Notes pursuant to this Agreement will not be registered under the Securities Act or qualified under applicable state securities laws on the grounds that the offering and sale of securities contemplated by this Agreement are exempt from registration under the Securities Act and exempt from qualification or registration under applicable state securities laws, and that the Company's reliance upon such exemptions is predicated upon such Purchaser's representations set forth in this Agreement. Such Purchaser acknowledges and understands that resale of the

Securities may be restricted indefinitely unless the Securities are subsequently registered under the Securities Act and qualified under applicable state securities laws or an exemption from such registration and such qualification is available.

(c)     No Transfer.   Such Purchaser acknowledges that the Securities may be transferred or assigned by the Purchaser thereof in whole or in part, provided that (a) the Company shall have received a letter secured by the Purchaser from the Securities and Exchange Commission stating that no action will be recommended to the Commission with respect to the proposed disposition; (b) there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement; (c) the proposed disposition is in compliance with Rule 144 of the Securities Act; or (d) the transferor provides, at the Company's request, an opinion of counsel reasonably satisfactory to the Company that such transfer does not require registration under the Securities Act and the securities law applicable with respect to any other applicable jurisdiction. Notwithstanding the foregoing, the Securities may be transferred by a Purchaser: (i) which is a partnership to a limited, general or retired partner of such partnership; (ii) which is a limited liability company to any member or former member; (iii) to any affiliate, including affiliated funds; or (iv) to any family member or trust for the benefit of the Purchaser if the Purchaser is an individual; provided in each case that (A) the transferee agrees in writing to be subject to the terms of this Agreement and (B) the Purchaser delivers written notice of such transfer to the Company.

(d)     Knowledge and Experience.   Such Purchaser: (i) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of such Purchaser's prospective investment in the Securities; (ii) has the ability to bear the economic risks of such Purchaser's prospective investment; (iii) has had all questions which have been asked by such Purchaser satisfactorily answered by the Company; and (iv) has not been offered the Securities by any form of advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or any seminar or meeting whose attendees have been invited by any such media.

(e)     Access to Information.   Such Purchaser represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms of the transactions contemplated hereby, and the business, properties, prospects and financial condition of the Company.  Such Purchaser further acknowledges that it has received and reviewed all information it has deemed appropriate or necessary to enable such Purchaser to evaluate whether to enter into this Agreement and to consummate the transactions contemplated hereby.

(f)     Accredited Investor.   Such Purchaser: (i) is an "Accredited Investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act, and (ii) has the ability to bear the economic risks of such Purchaser's prospective investment, including a complete loss of such Purchaser's investment in the Securities.

(g)     Not Organized to Purchase.   Such Purchaser has not been organized for the purpose of purchasing the Securities.

(h)     Refusal to Transfer.   The Company need not register a transfer of the Securities, and may also instruct its transfer agent not to register the transfer of the Securities,

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

unless the transfer will satisfy the restrictions on transfer set forth in this Agreement and federal and state securities laws.

(i)   <u>Additional Representations and Warranties of Non U.S. Persons</u>.  Each Purchaser who is a Non-U.S. person (as that term is defined below) hereby represents and warrants to the Company as follows:

(i)   Such Purchaser is not a "U.S. Person" (as defined in Rule 902(k) under the Securities Act), which term includes individual residents of the United States, corporations or other entities organized under the laws of the United States and corporations or entities the equity holders of which are residents of the United States.

(ii)   Such Purchaser is not acquiring the Securities for the account or benefit of any "U.S. Person," nor is such Purchaser acquiring the Securities with the intent to offer, reoffer, sell, assign, transfer, pledge, encumber or otherwise dispose of or distribute, directly or indirectly, such Securities except in accordance with Regulation S promulgated under the Securities Act, pursuant to an available exemption from registration under the Securities Act and any applicable state securities laws.

(iii)   Such Purchaser understands and agrees that each certificate held by such Non-U.S. person representing the Financing Stock or Common Stock, or any other securities issued in respect of the Securities upon conversion thereof upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by this Agreement, by Sections 417 and 418 of the California Corporations Code or under applicable state securities laws):

THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S PROMULGATED UNDER THE SECURITIES ACT, PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION.  HEDGING TRANSACTIONS INVOLVING THE SHARES REPRESENTED HEREBY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT.  THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE, HYPOTHECATION OR ANY OTHER TRANSFER OF ANY INTEREST IN ANY OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

(iv)   If a Purchaser is a Non-U.S. person, such Purchaser hereby represents that such Purchaser is satisfied as to the full observance of the laws of such Purchaser's jurisdiction in connection with any invitation to subscribe for the Securities or any use of the Agreements, including (a) the legal requirements within such Purchaser's jurisdiction for the

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

purchase or exchange of Securities, (b) any foreign exchange restrictions applicable to such purchase or exchange, (c) any governmental or other consents that may need to be obtained and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, exchange or transfer of such securities. Such Purchaser's subscription and payment for, and such Purchaser's continued beneficial ownership of, the Securities will not violate any applicable securities or other laws of such Purchaser's jurisdiction.

        (j)    <u>No "Bad Actor" Disqualification Events</u>.  Neither such Purchaser nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members is subject to any Disqualification Event (as defined above), except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) under the Securities Act and disclosed in writing in reasonable detail to the Company.

5.        <u>Conditions to Closing</u>.

        (a)    <u>Conditions to Obligations of the Purchasers</u>.  The obligation of each Purchaser to purchase the Notes at a Closing is subject to the fulfillment on or prior to the date of such Closing of the following conditions, any of which may be waived by that Purchaser:

        (1)    The representations and warranties made by the Company in <u>Section 3</u> hereof shall be true and correct on and as of the date of such Closing; and the Company shall have performed all obligations and conditions herein required to be performed or observed by the Company on or prior to the date of such Closing.

        (2)    The Company shall have obtained any and all consents (including all governmental or regulatory consents, approvals or authorizations required in connection with the valid execution and delivery of this Agreement), permits and waivers necessary or appropriate for consummation of the transactions contemplated by this Agreement.

        (3)    The purchase of the Notes by each Purchaser hereunder shall be legally permitted by all laws and regulations to which the Purchaser and the Company are subject.

        (4)    The initial principal balance of each Note purchased by each other Purchaser purchasing Notes at such Closing shall equal or exceed $500,000.

        (b)    <u>Conditions to the Company's Obligations</u>. The Company's obligation to sell and issue the Notes at a Closing is subject to the fulfillment to the Company's satisfaction on or prior to the date of such Closing of the following conditions, any of which may be waived by the Company:

        (1)    The representations and warranties made by each of the Purchasers in <u>Section 4</u> hereof shall true and correct on and as of the date of such Closing; and the Purchasers shall have performed all obligations and conditions herein required to be performed or observed by the Purchasers on or prior to the date of such Closing.

        (2)    The Company shall have obtained any and all consents (including all governmental or regulatory consents, approvals or authorizations required in connection with

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

the valid execution and delivery of this Agreement), permits and waivers necessary or appropriate for consummation of the transactions contemplated by this Agreement.

(3)    The purchase of the Notes by each Purchaser hereunder shall be legally permitted by all laws and regulations to which the Purchaser and the Company are subject.

(4)    Each Purchaser shall have delivered its respective Purchase Price to the Company.

(5)    The initial principal balance of each Note purchased by each Purchaser purchasing Notes at such Closing shall equal or exceed $500,000.

6.     Post-Close Covenant.  Other than as approved by a Majority in Interest, the Company shall not create, or authorize the creation of, or issue, or authorize the issuance of any Debt Security, or permit any subsidiary to take any such action with respect to any Debt Security. This Section 6 shall automatically terminate and be of no further force and effect upon a Conversion Transaction or upon the repayment of the Obligations (as defined in the Note).

7.     Miscellaneous.

(a)    Binding Agreement.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto.  Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

(b)    Waivers and Amendments.  Neither this Agreement nor the Notes, or any provision thereof, may be amended, waived, discharged or terminated orally, but only by a statement in writing.  With the written consent of those holders of not less than a majority in principal amount of the then outstanding aggregate principal amount of the Notes, the obligations of the Company and the rights of the Purchasers under this Agreement and/or the Notes may be waived (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely), and with the same consent the Company, when authorized by resolution of its Board of Directors, may enter into a supplementary agreement for the purpose of adding any provisions to or amending in any manner or eliminating any of the provisions of this Agreement and/or the Notes.  Any amendment or waiver affected in accordance with this Section 7(b) shall be binding upon the Company, each Purchaser and each transferee of a Note.  Notwithstanding the foregoing, no such amendment, waiver, discharge or termination shall, without the affected Purchaser's written consent, reduce (i) the principal amount of any Note or (ii) the rate of interest of any Note.

(c)    Governing Law.  This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California or of any other state.

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

     (d)    <u>Entire Agreement</u>.  This Agreement together with the exhibits attached hereto constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

     (e)    <u>Notices, etc.</u>  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon the earlier of (i) when received, (ii) when delivered personally, (iii) one (1) business day after being delivered by electronic mail or facsimile (with receipt of appropriate confirmation), (iv) one (1) business day after being deposited with an overnight courier service or (v) four (4) days after being deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.

     (f)    <u>Expenses</u>.  Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement.

     (g)    <u>No Finder's Fees</u>.  Each party represents that it neither is nor will be obligated for any finder's or broker's fee or commission in connection with this transaction.  Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finders' or broker's fee (and any asserted liability) for which such Purchaser or any of its officers, partners, employees, or representatives is responsible.  The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee (and any asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

     (h)    <u>Validity</u>.  If any provision of this Agreement or the Notes shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

     (i)    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

     (j)    <u>Pronouns</u>.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

     (k)    <u>Acknowledgment; Waiver of Conflicts</u>.  Each Purchaser acknowledges that: (a) it has read the Transaction Documents; (b) it has been represented in the preparation, negotiation and execution of the Transaction Documents by legal counsel of its own choice or has voluntarily declined to seek such counsel; and (c) it understands the terms and consequences of the Transaction Documents and is fully aware of the legal and binding effect of the Transaction Documents.  Each Purchaser understands that the Company has been represented in the preparation, negotiation and execution of the Transaction Documents by DLA Piper LLP (US), counsel to the Company ("**DLA**"), and that DLA has not represented any Purchaser or any stockholder, director or employee of the Company or any Purchaser in the preparation, negotiation and execution of the Transaction Documents.  Each Purchaser acknowledges that DLA has in the past represented and is now or may in the future represent one or more Purchasers

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

or their affiliates in matters unrelated to the transactions contemplated by the Transaction Documents, including the representation of such Purchaser or their affiliates in matters of a nature similar to those contemplated by the Transaction Documents. The Company and each Purchaser that DLA has represented in other matters hereby acknowledges that it has had an opportunity to ask for and has obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation, and hereby waives any conflict arising out of such representation with respect to the matters contemplated by the Transaction Documents.

(l)     Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of Page Intentionally Left Blank]*

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**COMPANY:**

BOUXTIE INC.

By: _Renato Libric_
5F18C08297184E9...
_____
Name: Renato Libric
Title: Chief Executive Officer

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

WEST271047612.1

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

PURCHASER:

*MOOSE RUN, LLC*

By: *David E. Lipson*
    DO1B4306389B440
Name: David E. Lipson
Title:  Managing Member

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

WEST\271047612.1

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

# **EXHIBIT A**

SCHEDULE OF PURCHASERS

Moose Run, LLC, A Wyoming limited liability company

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

## **EXHIBIT B**

FORM OF UNSECURED CONVERTIBLE PROMISSORY NOTE

# EXHIBIT 2

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

Execution Copy

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT.

## UNSECURED CONVERTIBLE PROMISSORY NOTE

$ 1,500,000.00(USA Dollars)                                    <u>October 13, 2017</u>

FOR VALUE RECEIVED, BOUXTIE Inc., a Delaware corporation (the "***Company***"), promises to pay to Moose Run, LLC a Wyoming Limited Liability Company (the "***Holder***"), or such Holder's registered assigns, in lawful money of the United States of America, the principal sum of $1,500,000.00 (USA Dollars), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Unsecured Convertible Promissory Note (this "***Note***") on the unpaid principal balance at a rate equal to Three and one-half percent (3.5%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder (the "***Obligations***"), if not converted by the provisions of <u>Section 5</u> below, shall be due and payable on demand at any time after the earlier of (i) January 31st, 2019 (the "***Maturity Date***"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Holder in accordance with <u>Section 3</u> herein or made automatically due and payable in accordance with the terms hereof.  This Note is one of a series of unsecured convertible promissory notes (collectively, the "***Notes***"), containing substantially identical terms and conditions issued pursuant to the Note Purchase Agreement dated as of October 13, 2017 (as amended, modified or supplemented, the "***Purchase Agreement***"), by and between the Company and the Purchasers (as defined in the Purchase Agreement), and the holders of the Notes are referred to herein as the "***Holders***."

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.     <u>Definitions</u>.   As used in this Note, the following capitalized terms have the following meanings:

(a)     "***Change of Control***" shall mean (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation); or (ii) a sale of all or substantially all of the assets of the Company, in either case, in which the stockholders of the Company immediately

**EXHIBIT 2**

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

prior to the acquisition or sale, as the case may be, do not hold a majority of the outstanding shares of capital stock of the surviving corporation.  Notwithstanding the foregoing, a transaction shall not be deemed a Change of Control if the sole purpose of the transaction is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction.

(b)   "***Common Stock***" shall mean the common stock of the Company, par value $0.00001 per share.

(c)   "***Majority in Interest***" shall mean more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement.

(d)   "***Person***" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(e)   "***Qualified Financing***" shall mean an equity financing of the Company in which the Company issues shares of preferred stock in a transaction or series of transactions and receives an aggregate of at least $_10,000,000.00 (USA Dollars), in consideration of such issuance, including any and all notes which are converted into preferred stock (which inclusion shall include this Note and the other Notes issued under the Purchase Agreement).

(f)   "***Transaction Documents***" shall mean this Note, each of the other Notes issued under the Purchase Agreement and the Purchase Agreement.

2.   Events of Default.  The occurrence of any of the following shall constitute an "***Event of Default***" under this Note:

(a)   Failure to Pay.  The Company shall fail to pay (i) when due any principal payment on the due date hereunder, and such payment shall not have been made within thirty (30) days following the Company's receipt of written notice by the Majority in Interest of such failure to pay;

(b)   Voluntary Bankruptcy or Insolvency Proceedings.  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated in full or in part, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing;

(c)   Involuntary Bankruptcy or Insolvency Proceedings.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

part of its property, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered, or such proceeding shall not be dismissed or discharged within sixty (60) days after commencement of such proceeding;

(d)     Default on Other Debt Security.  The occurrence and declaration in writing of an event of default by the Company with respect to any other Debt Security (as defined in the Purchase Agreement) beyond any period of grace provided with respect thereto; or

(e)     Material Breach of Representation or Covenant.  The Company shall materially breach any representation or warranty contained in Section 3 or covenant contained in Section 6 of the Purchase Agreement, *provided*, *however*, that, if such material breach is curable, such material breach shall not constitute an "Event of Default" pursuant to this Section 2(e) if cured within thirty (30) days after the Company has received written notice thereof from the Majority in Interest.

3.     Rights of Holder Upon Default.  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in Sections 2(b) or 2(c)) and at any time thereafter during the continuance of such Event of Default, the Majority in Interest may, by written notice, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  Upon the occurrence or existence of any Event of Default described in Sections 2(b) and 2(c), immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Holder may exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

4.     Prepayment.  Except as provided herein, the Obligations may not be prepaid without the written consent of the Majority in Interest and the Holder.

5.     Conversion.

(a)     Automatic Conversion Upon Qualified Financing.  If on or before the Maturity Date the Company consummates a Qualified Financing, all of the Obligations under this Note shall be automatically converted into shares of the Company's next series of preferred stock (the "***Financing Stock***") as are issued in such Qualified Financing at the closing thereof, and such shares shall have the same terms and conditions as those issued to the other purchasers in the Qualified Financing.  The number of shares of Financing Stock that shall be issued to the Holder shall be determined by dividing the quotient obtained by dividing $37,500,000 by the fully-diluted capital stock of the Company (excluding any other convertible securities such as convertible notes, including these Notes, and warrants for preferred stock) immediately prior to the Company's consummation of the Qualified Financing.  The issuance of Financing Stock upon conversion of the Obligations shall be upon the terms and subject to the conditions applicable to the Qualified Financing, and the Holder will be required to become a party to all stock purchase and investor

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

rights agreements and be accorded the same rights and privileges and be subject to the same restrictions and obligations, as apply to the other parties subscribing for Financing Stock in such Qualified Financing; provided, that certain stockholder rights in connection with such Qualified Financing may be contingent upon minimum shareholdings.   Upon such conversion of the Obligations, the Holder hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Financing; *provided, however,* that such transaction documents are the same documents to be entered into with all other purchasers of the Financing Stock in connection with the Qualified Financing.   The Holder acknowledges that the transaction documents will contain customary representations and warranties and transfer restrictions (including a 180-day lock-up agreement in connection with an initial public offering). The Holder shall deliver the original Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) for cancellation at the closing of the Qualified Financing; *provided, however*, that upon satisfaction of the conditions set forth in this Section 5(a), this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. If a Qualified Financing is not consummated within 120 days of the issuance of this note then Holder may at it option convert said note to Common Stock under the same terms as set forth on provisions relating to Conversion Upon Change of Control paragraph 5(b).

(b)     Conversion Upon Change of Control.  If prior to the earlier of the Maturity Date or the date of a Qualified Financing, the Company intends to consummate a Change of Control transaction, all of the Obligations under this Note shall be automatically converted into shares of Common Stock immediately prior to the consummation of such Change of Control transaction.  The number of shares of Common Stock that shall be issued to the Holder shall be determined by dividing the quotient obtained by dividing $37,500,000 by the Fully-Diluted Capital Stock of the Company immediately prior to the Company's consummation of the Change of Control.  "*Fully-Diluted Capital Stock*" shall mean, as of immediately prior to conversion of this Note, the sum of (i) the outstanding shares of common stock of the Company; (ii) the shares of common stock of the Company directly or indirectly issuable upon conversion or exchange of all outstanding securities directly or indirectly convertible into or exchangeable for common stock of the Company and the exercise of all outstanding options and warrants; and (iii) the shares of common stock of the Company reserved under any equity incentive or similar plan of the Company and any increase in the number of shares reserved for issuance under the Company's equity incentive or similar plans or arrangements in connection with the financing; provided that the Fully Diluted Capitalization shall not include (i) the Notes and any related warrants and the securities directly or indirectly issuable upon conversion or exchange of the Notes and the exercise of any such related warrants, (ii) other outstanding convertible promissory notes and any related warrants and the securities directly or indirectly issuable upon conversion or exchange of such other outstanding convertible promissory notes and the exercise of any such related warrants, or (iii) any securities issued in the financing, any shares of common stock of the Company directly or indirectly issuable upon conversion, exchange or exercise of such securities.  The Company shall notify the Holder of the proposed effective date of the Change of Control at least five (5) calendar days prior to the effectiveness thereof.   As promptly as practicable after a notice of optional conversion is delivered to the Company pursuant to this Section 5(b), (i) the Holder shall deliver the original Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Holder agrees to indemnify the

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

Company from any loss incurred by it in connection with this Note) for cancellation and (ii) the Company shall take all action necessary to complete the conversion of this Note and the issuance of the Common Stock prior to the closing of the Change of Control; *provided, however*, that upon satisfaction of the conditions set forth in this <u>Section 5(b)</u>, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(c)     <u>Optional Conversion Upon Maturity Date</u>.  In the event that any portion of the Obligations remain unpaid on the Maturity Date, then the Majority in Interest or the Holder may elect, by written notice delivered to the Company, to convert all or any part of the Obligations under this Note immediately upon the Maturity Date into shares of Common Stock. The number of shares of Common Stock that shall be issued to the Holder shall be the greater of: (i) the quotient obtained by dividing (A) the fair market value of the Company's outstanding capital stock as determined by the Company's Board of Directors in the good faith exercise of its reasonable judgment on a controlling and fully-marketable basis immediately prior to the consummation of the conversion of the Note on the Maturity Date by (B) the fully-diluted capital stock of the Company (excluding any other convertible securities such as convertible notes, including these Notes, and warrants for preferred stock) immediately prior to the consummation of the conversion of the Note on the Maturity Date, or (ii) the quotient obtained by dividing (A) $37,500,000 by (B) the fully-diluted capital stock of the Company (excluding any other convertible securities such as convertible notes, including these Notes, and warrants for preferred stock) immediately prior to the consummation of the conversion of the Note on the Maturity Date. As promptly as practicable after a notice of optional conversion is delivered to the Company pursuant to this <u>Section 5(c)</u>, (i) the Holder shall deliver the original Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) for cancellation and (ii) the Company shall take all action necessary to complete the conversion of this Note and the issuance of the Common Stock on the Maturity Date; provided, however, that upon satisfaction of the conditions set forth in this <u>Section 5(c)</u>, this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)     <u>Additional Mechanics of Conversion</u>.   The Company shall, within a reasonable period following the Holder's surrender of this Note or following the full satisfaction of the conditions set forth in <u>Section 5(a)</u>, <u>5(b)</u> or <u>5(c)</u>, as applicable, issue and deliver to the Holder a certificate or certificates for the number of shares of the series or class of stock to which the Holder shall be entitled upon conversion (bearing such legends as are required by any applicable stock purchase agreement, stockholder agreements and applicable state and federal securities laws in the option of counsel to the Company) together with a replacement Note (if any amount of the Obligations is not converted) and any other securities and property to which the Holder is entitled upon such conversion under the terms of this Note.  The conversion shall be deemed to have been made immediately prior to the close of business on the date of the surrender of this Note or the date on which there has been full satisfaction of the conditions set forth in <u>Section 5(a)</u>, <u>5(b)</u> or <u>5(c)</u>, as applicable, and the Person or Persons entitled to receive the shares of stock upon such conversion shall be treated for all purposes as the record Holder or Holders of such shares of stock as of such date.

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

(e)     <u>Minimum Interest in Company.</u>  This Note shall convert to a number of shares which will supply Holder with a minimum of 3.99% interest in the Company at the time of conversion.

(f)     <u>Fractional Shares; Effect of Conversion</u>.  No fractional shares shall be issued upon conversion of this Note.  Upon the conversion of all of the Obligations outstanding under this Note, in lieu of issuing any fractional shares to the Holder, the number of shares issued to the Holder shall be rounded up to the nearest whole share.  Upon conversion of this Note in full, the Company shall be forever released from all its obligations and liabilities under this Note.

6.     <u>Successors and Assigns</u>.  Subject to the restrictions on transfer described in <u>Section 8</u> below, the rights and obligations of the Company and the Holder of this Note shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

7.     <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified only in compliance with Section 7(b) of the Purchase Agreement.

8.     <u>Transfer of this Note or Securities Issuable on Conversion Hereof</u>.  Holder acknowledges that this Note and/or any securities into which this Note may be converted (collectively, the "*Securities*") may be transferred or assigned by Holder thereof in whole or in part, *provided* that (a) the Company shall have received a letter secured by Holder from the Securities and Exchange Commission stating that no action will be recommended to the Commission with respect to the proposed disposition; (b) there is then in effect a registration statement under the Securities Act of 1933, as amended (the "*Securities Act*"), covering such proposed disposition and such disposition is made in accordance with said registration statement; (c) the proposed disposition is in compliance with Rule 144 of the Securities Act; or (d) the transferor provides, at the Company's request, an opinion of counsel reasonably satisfactory to the Company that such transfer does not require registration under the Securities Act and the securities law applicable with respect to any other applicable jurisdiction. Notwithstanding the foregoing, the Securities may be transferred by Holder: (i) which is a partnership to a limited, general or retired partner of such partnership; (ii) which is a limited liability company to any member or former member; (iii) to any affiliate, including affiliated funds; or (iv) to any family member or trust for the benefit of Holder if the Holder is an individual; *provided* in each case that (A) the transferee agrees in writing to be subject to the terms of this Agreement and (B) Holder delivers written notice of such transfer to the Company.

9.     <u>Treatment of Note</u>.  To the extent permitted by generally accepted accounting principles, the Company will treat, account and report the Note as debt and not equity for accounting purposes and with respect to any returns filed with federal, state or local tax authorities.

10.     <u>Notices</u>.  Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered pursuant to Section 7(e) of the Purchase Agreement.

11.     <u>No Rights as Stockholder</u>.  This Note, as such, shall not entitle the Holder to any voting rights or other rights as a stockholder of the Company.  In the absence of conversion of this Note into preferred stock of the Company, no provisions of this Note, and no enumeration of the

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

rights or privileges of the Holder, shall cause the Holder to be a stockholder of the Company for any purpose.

12. <u>Pari Passu Notes</u>.  The Holder acknowledges and agrees that the payment of all or any portion of the Obligations shall be *pari passu* in right of payment and in all other respects to (i) the other Notes issued pursuant to the Purchase Agreement or pursuant to the terms of such Notes and (ii) all existing indebtedness of the Company.  In the event the Holder receives payments in excess of its pro rata share of the Company's payments to the holders of all of the Notes, then the Holder shall hold in trust all such excess payments for the benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

13. <u>Usury</u>.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

14. <u>Expenses; Waivers</u>.  If action is instituted to collect this Note, the Company promises to pay all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Holder in connection with such action.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

15. <u>Governing Law</u>.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California or of any other state.

*[Remainder of Page Intentionally Blank]*

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

IN WITNESS WHEREOF, the Company has caused this Unsecured Convertible Promissory Note to be issued as of the date first set forth above.

**BOUXTIE INC.**

By: _Renato Libric_____

Renato Libric
Chief Executive Officer

SIGNATURE PAGE TO UNSECURED CONVERTIBLE PROMISSORY NOTE

# EXHIBIT 3

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

## AGREEMENT FOR SALE AND PURCHASE OF STOCK

This Agreement for Sale and Purchase of Stock is made on the 19th day of October, 2017 by and between Renato Libric ("SELLER"), shareholder of BOUXTIE Inc. and Moose Run, LLC ("BUYER") (collectively, "PARTIES").

### RECITALS

1)  BOUXTIE Inc., (the "Corporation") is organized under the laws of and is in good standing in the State of Delaware.

2)  SELLER owns 6,100,000 shares of stock (Stock) of the Corporation.    These shares constitute 25.76 % of the issued Stock in the Corporation.

3)  BUYER is interested in purchasing a certain amount of SELLER's Stock in the Corporation and SELLER is interested in selling a portion of their Stock in the Corporation to BUYER.

4)  Therefore, SELLERS and BUYER agree as follows:

### AGREEMENT

1)  **Purchase Price.** SELLER agrees to sell, the Stock in the Corporation owned by SELLER that in total is equal to no less than 3.99% interest in the Corporation at the time of the sale. The price is One Million Five Hundred Thousand Dollars ($1,500,000), which shall be paid by BUYER in cash or wire transfer.

2)  **Number of Shares**. The number of shares held by the SELLER and subject to BUYER's purchase shall be as follows:
    (a) The number of shares of Stock that shall be eligible for purchase by the Purchaser shall be determined by dividing the quotient obtained by $37,500,000 by the fully diluted capital stock of the Company immediately prior to the Company's consummation of the Qualified financing.
    (b) This number of shares of stock is determined identically to the definition in paragraph 5 of the Unsecured Convertible Promissory Note Agreement dated October 13, 2017 and attached hereto.
    (c) The price to be paid by Purchaser for the stock described above shall be $1,500,000.
    (d) Upon BUYER'S written notice to SELLER, SELLER shall sell the requested Stock to BUYER within ten days of the written notice.

3)  **Number of Purchases**. BUYER can make no more than three purchases during the term of this agreement.   BUYER is not obligated to purchase any or all the stock offered.
    (a) Each purchase must be for a minimum of $500,000 which will purchase one-third of the Stock available for purchase. Each purchase must be under the terms of this agreement.
    (b) Notice of purchase may be given at any time. Closing of the purchase must occur within ten (10) calendar days of notice.
    (c) Payment for any and all purchases must be made simultaneous with the Closing of the

---

**EXHIBIT 3**

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

purchase. Payment must be in cash or by wire transfer to SELLER.

4) **SELLERS' Representations and Warranties.** SELLER represents and warrants to BUYER as follows:

    (a) The Corporation is duly organized, validly existing and in good standing under the laws of the State of Delaware.   The Corporation is authorized to issue up to 26,000,000 shares of stock with a par value of $0.00001 per share.

    (b) SELLER has good and marketable title to 6,100,000 shares of the Corporation (which constitute 25.76% of the issued shares in the Corporation), free and clear of all liens and encumbrances.

    (c) SELLER represents that he has no knowledge of any legal action, suit, arbitration or other legal administrative or governmental proceeding or investigation pending or threatened against the Corporation.

    (d) The Corporation's board has approved the sale of the subject stock.   The resolution of the board is attached hereto.

5) **Indemnification.**   In addition to any indemnification provisions contained elsewhere in this Agreement, and without limiting the remedies of the parties hereunder, the PARTIES agree as follows:

    (a) SELLER shall indemnify and hold BUYER harmless from any loss, costs, expense or other damage (including without limitation, reasonable attorney fees and expenses) resulting from, arising out of or incurred with respect to (or, in the case of claims asserted against BUYER by a third party), alleged to result from, arise out of or have been incurred with respect to the falsity or breach of any representation made by SELLER.

    (b) An indemnified party under this section shall promptly give notice to the indemnifying party, after obtaining knowledge of any claim or the existence of facts as to which recovery may be sought against the indemnifying party because of the indemnities set forth above. If such indemnity shall arise from the claim of a third party, the indemnifying party shall have the right to assume the defense of any such claims or any litigation resulting from such a claim.   If the indemnifying party assumes the defense of a claim or any litigation, the indemnified party nevertheless has the right to cooperate in said defense.

    (c) The indemnifying party shall promptly reimburse the indemnified party for the amount of any judgment rendered or settlement entered into with respect to any claim by a third party in such litigation and for all losses and expenses legal or otherwise incurred by the indemnified party in connection with the defense of such claim or litigation and for all losses, damages and expenses suffered or incurred by the indemnified party with respect to the falsity or breach of any representation or agreement made herein.

6) **Duration of Agreement.** This agreement will commence on the date executed and will expire (whether or not executed by BUYER) on January 31, 2020.

7) **Transfer of Shares of Stock**.   At Closing SELLER shall deliver the shares of stock in the Corporation being purchased by BUYER, with each stock certificate endorsed to BUYER.

8) **Default.**   If either party defaults under this Agreement, the non-defaulting party may pursue any and all legal and equitable remedies.

9) **Notice.**   Any notice shall be sent by regular and certified mail to the party's respective mailing address below their signature block, below.

10) **Instruments of Further Assurance/Good Faith**.   Each of the parties agrees to execute and

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

deliver to the other party at or after closing any and all further instruments and documents as either may reasonably request in order to carry out the provisions of this Agreement.   The parties shall act in good faith in all respects relative to the transactions contemplated in this Agreement.

11) **Closing.**   The parties to this Agreement that the closing of the transactions contemplated by this Agreement shall take place and occur no more than ten days from the date BUYER notices SELLER of its intent to purchase, at a time and place mutually agreeable to the parties.      All parties represent that they have not utilized the services of a broker or professional to effect the purchase and sale of the Assets, therefore either parties' obligation or commitment to pay a commission or fee related to the purchase or sale of such Assets is not an integral part of this Agreement.

12) **Attorney Fees.**   In the event either party finds it necessary to employ counsel in order to enforce, rescind or interpret any term or provision of this Agreement, including any proceeding in bankruptcy, the prevailing party shall be entitled to recover from the other party in addition to costs and disbursements allowed by law, the prevailing party's reasonable attorney's fees.

13) **Governing Law.**   This Agreement shall be construed pursuant to the laws of the State of California.   The sole venue for any action brought to enforce, rescind or interpret any term or provision of this Agreement shall be California.

14) **Amendment.**   This Agreement may only be altered or amended with the written consent of both parties setting forth such changes.

15) **Binding Effect.**   This Agreement shall be binding upon the parties individually and their respective assigns, heirs, devisees and representatives.


DATED this 19th day of October, 2017.


**SELLER**

DocuSigned by:

*Renato Libric*

5F18C08297164E9...

Renato Libric


**BUYER**
Moose Run, LLC

DocuSigned by:

By: *David E. Lipson*

DC1B43C6389B440...

Name: David E. Lipson

Its:   Managing Member

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

Execution Copy

THIS NOTE AND THE SECURITIES ISSUABLE UPON THE CONVERSION HEREOF HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED OR HYPOTHECATED UNLESS THERE IS AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT COVERING SUCH SECURITIES, THE SALE IS MADE IN ACCORDANCE WITH RULE 144 UNDER THE ACT, OR THE COMPANY RECEIVES AN OPINION OF COUNSEL FOR THE HOLDER OF SUCH SECURITIES REASONABLY SATISFACTORY TO THE COMPANY STATING THAT SUCH SALE, TRANSFER, ASSIGNMENT OR HYPOTHECATION IS EXEMPT FROM THE REGISTRATION AND PROSPECTUS DELIVERY REQUIREMENTS OF THE ACT.

## UNSECURED CONVERTIBLE PROMISSORY NOTE

$ 1,500,000.00(USA Dollars)                                          October 13, 2017

FOR VALUE RECEIVED, BOUXTIE Inc., a Delaware corporation (the "*Company*"), promises to pay to Moose Run, LLC a Wyoming Limited Liability Company (the "*Holder*"), or such Holder's registered assigns, in lawful money of the United States of America, the principal sum of $1,500,000.00 (USA Dollars), or such lesser amount as shall equal the outstanding principal amount hereof, together with simple interest from the date of this Unsecured Convertible Promissory Note (this "*Note*") on the unpaid principal balance at a rate equal to Three and one-half percent (3.5%) per annum, computed on the basis of the actual number of days elapsed and a year of 365 days.  All unpaid principal, together with any then unpaid and accrued interest and other amounts payable hereunder (the "*Obligations*"), if not converted by the provisions of Section 5 below, shall be due and payable on demand at any time after the earlier of (i) January 31st, 2019 (the "*Maturity Date*"), or (ii) when, upon or after the occurrence of an Event of Default (as defined below), such amounts are declared due and payable by the Holder in accordance with Section 3 herein or made automatically due and payable in accordance with the terms hereof.  This Note is one of a series of unsecured convertible promissory notes (collectively, the "*Notes*"), containing substantially identical terms and conditions issued pursuant to the Note Purchase Agreement dated as of October 13, 2017 (as amended, modified or supplemented, the "*Purchase Agreement*"), by and between the Company and the Purchasers (as defined in the Purchase Agreement), and the holders of the Notes are referred to herein as the "*Holders*."

The following is a statement of the rights of the Holder and the conditions to which this Note is subject, and to which the Holder, by the acceptance of this Note, agrees:

1.    Definitions.  As used in this Note, the following capitalized terms have the following meanings:

(a)    "*Change of Control*" shall mean (i) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation); or (ii) a sale of all or substantially all of the assets of the Company, in either case, in which the stockholders of the Company immediately

WEST\271117324.2

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

prior to the acquisition or sale, as the case may be, do not hold a majority of the outstanding shares of capital stock of the surviving corporation.  Notwithstanding the foregoing, a transaction shall not be deemed a Change of Control if the sole purpose of the transaction is to change the state of the Company's incorporation or to create a holding company that will be owned in substantially the same proportions by the persons who held the Company's securities immediately prior to such transaction.

(b)      "*Common Stock*" shall mean the common stock of the Company, par value $0.00001 per share.

(c)      "*Majority in Interest*" shall mean more than 50% of the aggregate outstanding principal amount of the Notes issued pursuant to the Purchase Agreement.

(d)      "*Person*" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, an unincorporated association, a joint venture or other entity or a governmental authority.

(e)      "*Qualified Financing*" shall mean an equity financing of the Company in which the Company issues shares of preferred stock in a transaction or series of transactions and receives an aggregate of at least $_10,000,000.00 (USA Dollars), in consideration of such issuance, including any and all notes which are converted into preferred stock (which inclusion shall include this Note and the other Notes issued under the Purchase Agreement).

(f)      "*Transaction Documents*" shall mean this Note, each of the other Notes issued under the Purchase Agreement and the Purchase Agreement.

2.      Events of Default.  The occurrence of any of the following shall constitute an "*Event of Default*" under this Note:

(a)      Failure to Pay.  The Company shall fail to pay (i) when due any principal payment on the due date hereunder, and such payment shall not have been made within thirty (30) days following the Company's receipt of written notice by the Majority in Interest of such failure to pay;

(b)      Voluntary Bankruptcy or Insolvency Proceedings.  The Company shall (i) apply for or consent to the appointment of a receiver, trustee, liquidator or custodian of itself or of all or a substantial part of its property, (ii) be unable, or admit in writing its inability, to pay its debts generally as they mature, (iii) make a general assignment for the benefit of its or any of its creditors, (iv) be dissolved or liquidated in full or in part, (v) become insolvent (as such term may be defined or interpreted under any applicable statute), (vi) commence a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect or consent to any such relief or to the appointment of or taking possession of its property by any official in an involuntary case or other proceeding commenced against it, or (vii) take any action for the purpose of effecting any of the foregoing;

(c)      Involuntary Bankruptcy or Insolvency Proceedings.  Proceedings for the appointment of a receiver, trustee, liquidator or custodian of the Company or of all or a substantial

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

part of its property, or an involuntary case or other proceedings seeking liquidation, reorganization or other relief with respect to the Company or the debts thereof under any bankruptcy, insolvency or other similar law now or hereafter in effect shall be commenced and an order for relief entered, or such proceeding shall not be dismissed or discharged within sixty (60) days after commencement of such proceeding;

(d)     <u>Default on Other Debt Security</u>.  The occurrence and declaration in writing of an event of default by the Company with respect to any other Debt Security (as defined in the Purchase Agreement) beyond any period of grace provided with respect thereto; or

(e)     <u>Material Breach of Representation or Covenant</u>.  The Company shall materially breach any representation or warranty contained in Section 3 or covenant contained in Section 6 of the Purchase Agreement, *provided*, *however*, that, if such material breach is curable, such material breach shall not constitute an "Event of Default" pursuant to this <u>Section 2(e)</u> if cured within thirty (30) days after the Company has received written notice thereof from the Majority in Interest.

3.     <u>Rights of Holder Upon Default</u>.  Upon the occurrence or existence of any Event of Default (other than an Event of Default described in <u>Sections 2(b)</u> or <u>2(c)</u>) and at any time thereafter during the continuance of such Event of Default, the Majority in Interest may, by written notice, declare all outstanding Obligations payable by the Company hereunder to be immediately due and payable without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  Upon the occurrence or existence of any Event of Default described in <u>Sections 2(b)</u> and <u>2(c)</u>, immediately and without notice, all outstanding Obligations payable by the Company hereunder shall automatically become immediately due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived.  In addition to the foregoing remedies, upon the occurrence or existence of any Event of Default, the Holder may exercise any other right, power or remedy granted to it by the Transaction Documents or otherwise permitted to it by law, either by suit in equity or by action at law, or both.

4.     <u>Prepayment</u>.  Except as provided herein, the Obligations may not be prepaid without the written consent of the Majority in Interest and the Holder.

5.     <u>Conversion</u>.

(a)     <u>Automatic Conversion Upon Qualified Financing</u>.  If on or before the Maturity Date the Company consummates a Qualified Financing, all of the Obligations under this Note shall be automatically converted into shares of the Company's next series of preferred stock (the "***Financing Stock***") as are issued in such Qualified Financing at the closing thereof, and such shares shall have the same terms and conditions as those issued to the other purchasers in the Qualified Financing.  The number of shares of Financing Stock that shall be issued to the Holder shall be determined by dividing the quotient obtained by dividing $37,500,000 by the fully-diluted capital stock of the Company (excluding any other convertible securities such as convertible notes, including these Notes, and warrants for preferred stock) immediately prior to the Company's consummation of the Qualified Financing.  The issuance of Financing Stock upon conversion of the Obligations shall be upon the terms and subject to the conditions applicable to the Qualified Financing, and the Holder will be required to become a party to all stock purchase and investor

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

rights agreements and be accorded the same rights and privileges and be subject to the same restrictions and obligations, as apply to the other parties subscribing for Financing Stock in such Qualified Financing; provided, that certain stockholder rights in connection with such Qualified Financing may be contingent upon minimum shareholdings.  Upon such conversion of the Obligations, the Holder hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Financing; *provided, however,* that such transaction documents are the same documents to be entered into with all other purchasers of the Financing Stock in connection with the Qualified Financing.  The Holder acknowledges that the transaction documents will contain customary representations and warranties and transfer restrictions (including a 180-day lock-up agreement in connection with an initial public offering).  The Holder shall deliver the original Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) for cancellation at the closing of the Qualified Financing; *provided, however*, that upon satisfaction of the conditions set forth in this Section 5(a), this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence. If a Qualified Financing is not consummated within 120 days of the issuance of this note then Holder may at it option convert said note to Common Stock under the same terms as set forth on provisions relating to Conversion Upon Change of Control paragraph 5(b).

(b)    Conversion Upon Change of Control.  If prior to the earlier of the Maturity Date or the date of a Qualified Financing, the Company intends to consummate a Change of Control transaction, all of the Obligations under this Note shall be automatically converted into shares of Common Stock immediately prior to the consummation of such Change of Control transaction.  The number of shares of Common Stock that shall be issued to the Holder shall be determined by dividing the quotient obtained by dividing $37,500,000 by the Fully-Diluted Capital Stock of the Company immediately prior to the Company's consummation of the Change of Control.  "*Fully-Diluted Capital Stock*" shall mean, as of immediately prior to conversion of this Note, the sum of (i) the outstanding shares of common stock of the Company; (ii) the shares of common stock of the Company directly or indirectly issuable upon conversion or exchange of all outstanding securities directly or indirectly convertible into or exchangeable for common stock of the Company and the exercise of all outstanding options and warrants; and (iii) the shares of common stock of the Company reserved under any equity incentive or similar plan of the Company and any increase in the number of shares reserved for issuance under the Company's equity incentive or similar plans or arrangements in connection with the financing; provided that the Fully Diluted Capitalization shall not include (i) the Notes and any related warrants and the securities directly or indirectly issuable upon conversion or exchange of the Notes and the exercise of any such related warrants, (ii) other outstanding convertible promissory notes and any related warrants and the securities directly or indirectly issuable upon conversion or exchange of such other outstanding convertible promissory notes and the exercise of any such related warrants, or (iii) any securities issued in the financing, any shares of common stock of the Company directly or indirectly issuable upon conversion, exchange or exercise of such securities.  The Company shall notify the Holder of the proposed effective date of the Change of Control at least five (5) calendar days prior to the effectiveness thereof.  As promptly as practicable after a notice of optional conversion is delivered to the Company pursuant to this Section 5(b), (i) the Holder shall deliver the original Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Holder agrees to indemnify the

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

Company from any loss incurred by it in connection with this Note) for cancellation and (ii) the Company shall take all action necessary to complete the conversion of this Note and the issuance of the Common Stock prior to the closing of the Change of Control; *provided, however*, that upon satisfaction of the conditions set forth in this Section 5(b), this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(c)       Optional Conversion Upon Maturity Date.  In the event that any portion of the Obligations remain unpaid on the Maturity Date, then the Majority in Interest or the Holder may elect, by written notice delivered to the Company, to convert all or any part of the Obligations under this Note immediately upon the Maturity Date into shares of Common Stock. The number of shares of Common Stock that shall be issued to the Holder shall be the greater of: (i) the quotient obtained by dividing (A) the fair market value of the Company's outstanding capital stock as determined by the Company's Board of Directors in the good faith exercise of its reasonable judgment on a controlling and fully-marketable basis immediately prior to the consummation of the conversion of the Note on the Maturity Date by (B) the fully-diluted capital stock of the Company (excluding any other convertible securities such as convertible notes, including these Notes, and warrants for preferred stock) immediately prior to the consummation of the conversion of the Note on the Maturity Date, or (ii) the quotient obtained by dividing (A) $37,500,000 by (B) the fully-diluted capital stock of the Company (excluding any other convertible securities such as convertible notes, including these Notes, and warrants for preferred stock) immediately prior to the consummation of the conversion of the Note on the Maturity Date. As promptly as practicable after a notice of optional conversion is delivered to the Company pursuant to this Section 5(c), (i) the Holder shall deliver the original Note (or a notice to the effect that the original Note has been lost, stolen or destroyed and an agreement acceptable to the Company whereby the Holder agrees to indemnify the Company from any loss incurred by it in connection with this Note) for cancellation and (ii) the Company shall take all action necessary to complete the conversion of this Note and the issuance of the Common Stock on the Maturity Date; provided, however, that upon satisfaction of the conditions set forth in this Section 5(c), this Note shall be deemed converted and of no further force and effect, whether or not it is delivered for cancellation as set forth in this sentence.

(d)       Additional Mechanics of Conversion.   The Company shall, within a reasonable period following the Holder's surrender of this Note or following the full satisfaction of the conditions set forth in Section 5(a), 5(b) or 5(c), as applicable, issue and deliver to the Holder a certificate or certificates for the number of shares of the series or class of stock to which the Holder shall be entitled upon conversion (bearing such legends as are required by any applicable stock purchase agreement, stockholder agreements and applicable state and federal securities laws in the option of counsel to the Company) together with a replacement Note (if any amount of the Obligations is not converted) and any other securities and property to which the Holder is entitled upon such conversion under the terms of this Note.  The conversion shall be deemed to have been made immediately prior to the close of business on the date of the surrender of this Note or the date on which there has been full satisfaction of the conditions set forth in Section 5(a), 5(b) or 5(c), as applicable, and the Person or Persons entitled to receive the shares of stock upon such conversion shall be treated for all purposes as the record Holder or Holders of such shares of stock as of such date.

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

     (e)    <u>Minimum Interest in Company.</u>  This Note shall convert to a number of shares which will supply Holder with a minimum of 3.99% interest in the Company at the time of conversion.

     (f)    <u>Fractional Shares; Effect of Conversion</u>.  No fractional shares shall be issued upon conversion of this Note.  Upon the conversion of all of the Obligations outstanding under this Note, in lieu of issuing any fractional shares to the Holder, the number of shares issued to the Holder shall be rounded up to the nearest whole share.  Upon conversion of this Note in full, the Company shall be forever released from all its obligations and liabilities under this Note.

    6.    <u>Successors and Assigns</u>.  Subject to the restrictions on transfer described in <u>Section 8</u> below, the rights and obligations of the Company and the Holder of this Note shall be binding upon and benefit the successors, assigns, heirs, administrators and transferees of the parties.

    7.    <u>Waiver and Amendment</u>.  Any provision of this Note may be amended, waived or modified only in compliance with Section 7(b) of the Purchase Agreement.

    8.    <u>Transfer of this Note or Securities Issuable on Conversion Hereof</u>.  Holder acknowledges that this Note and/or any securities into which this Note may be converted (collectively, the "*Securities*") may be transferred or assigned by Holder thereof in whole or in part, *provided* that (a) the Company shall have received a letter secured by Holder from the Securities and Exchange Commission stating that no action will be recommended to the Commission with respect to the proposed disposition; (b) there is then in effect a registration statement under the Securities Act of 1933, as amended (the "*Securities Act*"), covering such proposed disposition and such disposition is made in accordance with said registration statement; (c) the proposed disposition is in compliance with Rule 144 of the Securities Act; or (d) the transferor provides, at the Company's request, an opinion of counsel reasonably satisfactory to the Company that such transfer does not require registration under the Securities Act and the securities law applicable with respect to any other applicable jurisdiction. Notwithstanding the foregoing, the Securities may be transferred by Holder: (i) which is a partnership to a limited, general or retired partner of such partnership; (ii) which is a limited liability company to any member or former member; (iii) to any affiliate, including affiliated funds; or (iv) to any family member or trust for the benefit of Holder if the Holder is an individual; *provided* in each case that (A) the transferee agrees in writing to be subject to the terms of this Agreement and (B) Holder delivers written notice of such transfer to the Company.

    9.    <u>Treatment of Note</u>.  To the extent permitted by generally accepted accounting principles, the Company will treat, account and report the Note as debt and not equity for accounting purposes and with respect to any returns filed with federal, state or local tax authorities.

    10.    <u>Notices</u>.  Any notice, request or other communication required or permitted hereunder shall be in writing and shall be deemed to have been duly given if delivered pursuant to Section 7(e) of the Purchase Agreement.

    11.    <u>No Rights as Stockholder</u>.  This Note, as such, shall not entitle the Holder to any voting rights or other rights as a stockholder of the Company.  In the absence of conversion of this Note into preferred stock of the Company, no provisions of this Note, and no enumeration of the

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

rights or privileges of the Holder, shall cause the Holder to be a stockholder of the Company for any purpose.

12.    <u>Pari Passu Notes</u>.  The Holder acknowledges and agrees that the payment of all or any portion of the Obligations shall be *pari passu* in right of payment and in all other respects to (i) the other Notes issued pursuant to the Purchase Agreement or pursuant to the terms of such Notes and (ii) all existing indebtedness of the Company.  In the event the Holder receives payments in excess of its pro rata share of the Company's payments to the holders of all of the Notes, then the Holder shall hold in trust all such excess payments for the benefit of the holders of the other Notes and shall pay such amounts held in trust to such other holders upon demand by such holders.

13.    <u>Usury</u>.  In the event any interest is paid on this Note which is deemed to be in excess of the then legal maximum rate, then that portion of the interest payment representing an amount in excess of the then legal maximum rate shall be deemed a payment of principal and applied against the principal of this Note.

14.    <u>Expenses; Waivers</u>.  If action is instituted to collect this Note, the Company promises to pay all costs and expenses, including, without limitation, reasonable attorneys' fees and costs, incurred by Holder in connection with such action.  The Company hereby waives notice of default, presentment or demand for payment, protest or notice of nonpayment or dishonor and all other notices or demands relative to this instrument.

15.    <u>Governing Law</u>.  This Note and all actions arising out of or in connection with this Note shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California or of any other state.

*[Remainder of Page Intentionally Blank]*

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

IN WITNESS WHEREOF, the Company has caused this Unsecured Convertible Promissory Note to be issued as of the date first set forth above.

**BOUXTIE INC.**

By: _Renato Libric_

Renato Libric
Chief Executive Officer

SIGNATURE PAGE TO UNSECURED CONVERTIBLE PROMISSORY NOTE

WEST\271117324.2

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

Execution Copy

## AGREEMENT

This Agreement is entered into on the 13th of October 2017 by and between Moose Run LLC ("Purchaser"), Bouxtie Inc. ("Company") and Renato Libric ("Promoter") in conjunction with the Note Purchase Agreement entered into on the 13th of October 2017 and the Unsecured Convertible Note entered into on the 13th of October 2017.

This Agreement supplements and supersedes to the extent there is conflict between agreements matters covered by the Note Purchase Agreement and the Unsecured Convertible Note and is being offered in order to induce Purchaser to purchase the Unsecured Convertible Note being offered pursuant to the Note Purchase Agreement.

1. **Warranties, Representations and Covenants of the Company and Promoter:** The Company and Promoter hereby represent and warrant to Purchaser that, except as set forth on the Disclosure Schedule attached as <u>Exhibit A</u> to this Agreement (the "**Disclosure Schedule**"), if any, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Agreement Date at all time thereafter, except as otherwise indicated. The representations and warranties of the Company and Promoter shall survive closing of the Unsecured Convertible Note and be in place until such time that Purchaser no longer owns its Unsecured Convertible Note or Stock in the Company.

1.1 **Disclosure Schedule.** All disclosures contained in the Disclosure Schedule are true and accurate. There is no additional disclosure outside of the Disclosure Schedule.

1.2 **Organization, Good Standing, Corporate Power and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Incorporation and has all corporate power and corporate authority required (a) to carry on its business as presently conducted and as presently proposed to be conducted and (b) to execute, deliver and perform its obligations under this Agreement. The Company is duly qualified to transact business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the failure to so qualify or be in good standing would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of the Company.

1.3 **Capitalization.**

1.3.1 The authorized capital of the Company consists, immediately prior to the Agreement Date (unless otherwise noted), of the following:

(a) The common stock of the Company (the "**Common Stock**"), of which that number of shares of Common Stock equal to (a) the Common Shares Issued and Outstanding Pre-Money are issued and outstanding as of immediately prior to the Agreement Date, (b) the number of shares of Common Stock which are issuable on conversion of shares of the Financing Stock or Preferred Stock have been reserved for issuance upon conversion of the Unsecured Convertible Note to Financing Stock as part of a Qualified Financing Transaction and (c) the Total Post-Money Shares Reserved for Option Pool have been reserved for issuance pursuant to the Stock Plan, and of such Total Post-Money Shares Reserved for Option Pool, that number of shares of Common Stock equal to the Number of Issued And Outstanding Options are currently subject to outstanding options and that number of shares of Common Stock equal to the Unallocated Post-Money Option Pool Shares remain available for future issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The ratio determined by dividing (x) the Unallocated Post-Money Option Pool Shares by (y) the Fully-Diluted Share Number (as defined below) is equal to the Unallocated Post-Money Option Pool Percent. All of the outstanding shares of Common Stock are duly

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws.  The Stock Plan has been duly adopted by the Board of Directors of the Company (the "**Board**") and approved by the Company's stockholders.  For purposes of this Agreement, the term "**Fully-Diluted Share Number**" shall mean that number of shares of the Company's capital stock equal to the sum of (i) all shares of the Company's capital stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all options, warrants and other convertible securities and (ii) all shares of the Company's capital stock reserved and available for future grant under any equity incentive or similar plan.

   1.3.2 There are no outstanding preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock or Preferred Stock, except for (a) the conversion privileges of the Financing Stock Series Preferred Stock pursuant to the terms of the Restated Charter and (b) the securities and rights described in this Agreement.  Nor shall any preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock or Preferred Stock be issued except for those expressed in Section 1.19 of this Agreement.

   1.3.3 The Key Holders set forth in Schedule 1 (each a "**Key Holder**") hold that number of shares of Common Stock set forth opposite each such Key Holder's name in Section 1.3.3 of the Disclosure Schedule (such shares, the "**Key Holders' Shares**") and such Key Holders' Shares are subject to vesting and/or the Company's repurchase right on the terms specified in Section 1.3.3 of the Disclosure Schedule (the "**Key Holders' Vesting Schedules**").  Except as specified in Section 1.3.3 of the Disclosure Schedule, the Key Holders do not own or have any other rights to any other securities of the Company. The Key Holders' Vesting Schedules set forth in Section 1.3.3 of the Disclosure Schedule specify for each Key Holder (i) the vesting commencement date for each issuance of shares to or options held by such Key Holder, (ii) the number of shares or options held by such Key Holder that are currently vested, (iii) the number of shares or options held by such Key Holder that remain subject to vesting and/or the Company's repurchase right and (iv) the terms and conditions, if any, under which the Key Holders' Vesting Schedules would be accelerated. Other than the Key Holders' Shares, which vest pursuant to the applicable Key Holders' Vesting Schedules, (x) all options granted and Common Stock outstanding vest as follows: twenty-five percent (25%) of the shares vest one (1) year following the vesting commencement date, with the remaining seventy-five percent (75%) vesting in equal installments over the next three (3) years and (y) no stock plan, stock purchase, stock option or other agreement or understanding between the Company and any holder of any equity securities or rights to purchase equity securities provides for acceleration or other changes in the vesting provisions or other terms of such agreement or understanding as the result of (i) termination of employment (whether actual or constructive), (ii) any merger, consolidated sale of stock or assets, change in control or any other transaction(s) by the Company, or (iii) the occurrence of any other event or combination of events.

   1.3.4   There are no outstanding warrants or options that will dilute Purchaser's percentage ownership and right to convert to common stock in the Company pursuant to the purchase documents.

   1.3.5 The Seed Series, Series A, that has been issued previous to any subsequent Financing Stock conversions being offered to purchasers or convertible note holders under subsequent financing rounds do not contain any multiplier rights, preemptive rights or rights to purchase additional

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

stock except at the price being offered to other shareholders in subsequent series or issuances at the then offered price of said series.

      **1.4**    **Conversion Rate**. Upon conversion of the Unsecured Convertible Promissory Note, the Company shall provide to Purchaser the number of shares required for Purchaser to hold a minimum of 3.99% interest in the Company.  This is separate and apart from any additional investments made by Purchaser into the Company.

      **1.5**    **Operating Documents**.  The Company's Articles and By-laws and any amendments thereof are true and accurate and have been duly authorized in all material respects.

      **1.6**    **Subsidiaries**.  The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

      **1.7**    **Authorization**.  All corporate action has been taken, or will be taken prior to the applicable Closing, on the part of the Board and stockholders that is necessary for the authorization, execution and delivery of this Agreement by the Company and the performance by the Company of the obligations to be performed by the Company as of the date hereof under this Agreement.  This Agreement, when executed and delivered by the Company, shall constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

      1.7.1    Prior to closing a subsequent Qualified Financing Transaction an Amended and Restated Certificate of Incorporation shall be filed providing in part the following amendments:

      (a)    Authorizing the Issuance of Financing Stock Series Preferred Stock; and

      (b)    Authorizing the Company to grant either a Common Stock or Preferred Stock holder the right to appoint a director outside of the standard voting procedures.

      **1.8**    **Valid Issuance of Shares**.  The shares of Financing Stock Series Preferred Stock, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.  Subject to filings pursuant to Regulation D of the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, the offer, sale and issuance of the shares of Series of Preferred Stock to be issued pursuant to and in conformity with the terms of this Agreement and the issuance of the Common Stock, if any, to be issued upon conversion thereof for no additional consideration and pursuant to the Restated Charter, will be issued in compliance with all applicable federal and state securities laws.  The Common Stock issuable upon conversion of the shares Financing Stock Series Preferred Stock has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Charter, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser.  Subject to filings pursuant to Regulation D of the Securities Act and applicable state

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

securities laws, the Common Stock issuable upon conversion of the shares of Financing Stock Series Preferred Stock will be issued in compliance with all applicable federal and state securities laws.

**1.9** **Litigation**.  There is no pending action, suit, proceeding, arbitration, mediation, complaint, claim, charge or investigation before any court, arbitrator, mediator or governmental body or, to the Company's knowledge, currently threatened in writing (a) against the Company or (b) against any consultant, officer, director or key employee of the Company arising out of his or her consulting, employment or board relationship with the Company or that could otherwise materially impact the Company.

**1.10** **Intellectual Property**.  The Company owns or possesses sufficient legal rights to all Intellectual Property (as defined below) that is necessary to the conduct of the Company's business as now conducted and as presently proposed to be conducted (the "**Company Intellectual Property**") without any violation or infringement (or in the case of third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Company) of the rights of others.  No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any rights to any patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes (collectively, "**Intellectual Property**") of any other party, except that with respect to third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications the foregoing representation is made to the Company's knowledge only.  Other than with respect to commercially available software products under standard end-user object code license agreements, there is no outstanding option, license, agreement, claim, encumbrance or shared ownership interest of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person. The Company has not received any written communications alleging that the Company has violated or, by conducting its business, would violate any of the Intellectual Property of any other person.

**1.11** **Employee and Consultant Matters**.  Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms made available to the Purchasers or delivered to the counsel for the Purchasers. No current or former employee or consultant has excluded any work or invention from his or her assignment of inventions. To the Company's knowledge, no such employees or consultants is in violation thereof.  To the Company's knowledge, none of its employees is obligated under any judgment, decree, contract, covenant or agreement that would materially interfere with such employee's ability to promote the interest of the Company or that would interfere with such employee's ability to promote the interests of the Company or that would conflict with the Company's business. To the Company's knowledge, all individuals who have purchased unvested shares of the Company's Common Stock have timely filed elections under Section 83(b) of the Internal Revenue Code of 1986, as amended.

**1.12** **Compliance with Other Instruments**. The Company is not in violation or default (a) of any provisions of the Restated Charter or the Company's bylaws, (b) of any judgment, order, writ or decree of any court or governmental entity, (c) under any agreement, instrument, contract, lease, note, indenture, mortgage or purchase order to which it is a party that is required to be listed on the Disclosure Schedule, or, (d) to its knowledge, of any provision of federal or state statute, rule or regulation materially applicable to the Company.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any such violation or default, or constitute, with or without the passage of time and giving of notice, either (i) a default under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

purchase order or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

**1.13    Title to Property and Assets.**  The Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not affect material properties and assets of the Company.  With respect to the property and assets it leases, the Company is in material compliance with each such lease.

**1.14    Agreements.**  Except for this Agreement, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party that involve (a) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (b) the license of any Intellectual Property to or from the Company other than licenses with respect to commercially available software products under standard end-user object code license agreements or standard customer terms of service and privacy policies for Internet sites, (c) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other person, or that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (d) indemnification by the Company with respect to infringements of proprietary rights other than standard customer or channel agreements (each, a "**Material Agreement**").  The Company is not in material breach of any Material Agreement.  Each Material Agreement is in full force and effect and is enforceable by the Company in accordance with its respective terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) the effect of rules of law governing the availability of equitable remedies.

**1.15    Liabilities.**  The Company has no liabilities or obligations, contingent or otherwise, in excess of $25,000 individually or $100,000 in the aggregate.

**1.16    Appointment of Director.**  All corporate action has been taken, or will be taken prior to the applicable Closing, to appoint Dave Lipson as a director.  Dave Lipson will remain a director at all times while Purchaser is either a note holder or stock holder in the Company. If Dave Lipson is unable to act as director, Purchaser will appoint a successor.  Dave Lipson or his successor shall be granted a 1% common stock interest in consideration of Dave Lipson serving in an advisory role as a director to the Company fully vested at Closing of Financing Stock Series Preferred Stock. Company shall provide Director Liability Insurance in the amount of 10 million at all times during which David Lipson Serves as Director.

**1.17    Warrants.**  Purchaser shall have the right to double its investment at the 37,500,000 valuation which right shall be evidences by issuance of additional warrants or an option to purchase in favor of Purchaser upon Purchaser funding its initial investment contemplated by this Agreement.  The warrants or option shall be executable for a period of 3 years from the date of initial issuance at the same valuation as the initial investment and shall be redeemable from Company Stock or if not issued by the Company from the Common Stock of owned by Promoter in the Company.

**1.18    Assignment of Company's Preemptive Rights.**  The Company shall obtain at or prior to the Initial Closing, and shall maintain, a right of first refusal with respect to transfers of shares of Common Stock by each holder thereof, subject to certain standard exceptions.  If the Company elects not to exercise its right of first refusal with respect to a proposed transfer of the Company's outstanding securities by any Key Holder, the Company shall assign such right of first refusal to the Major Purchasers. In the event of such assignment, each Major Purchaser shall have a right to purchase that portion of the

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

securities proposed to be transferred by such Key Holder equal to the ratio of (a) the number of shares of the Company's Common Stock issued or issuable upon conversion of the shares of Financing Stock Series Preferred Stock owned by such Major Purchaser, to (b) the number of shares of the Company's Common Stock issued or issuable upon conversion of the shares of Financing Stock Series Preferred Stock owned by all Major Purchasers.

    **1.19**  **Reservation of Common Stock**.  The Company shall at all times reserve and keep available, solely for issuance and delivery upon the conversion of the Financing Stock Series Preferred Stock, all Common Stock issuable from time to time upon conversion of that number of shares of Financing Stock Series Preferred Stock equal to the Total Shares Authorized for Sale, regardless of whether or not all such shares have been issued at such time.

    **1.20**  **Major Purchaser**.  Purchaser is and shall be a Major Purchaser as defined in this Agreement and for purposes of this Agreement and the rights granted herein.

    **2.**  **PARTICIPATION RIGHT**.

    **2.1**  **General**.  Each Major Purchaser has the right of first refusal to purchase the Major Purchaser's Pro Rata Share of any New Securities (as defined below) that the Company may from time to time issue after the date of this Agreement, provided, however, the Major Purchaser will have no right to purchase any such New Securities if the Major Purchaser cannot demonstrate to the Company's reasonable satisfaction that such Major Purchaser is at the time of the proposed issuance of such New Securities an "accredited investor" as such term is defined in Regulation D under the Securities Act.  A Major Purchaser's "**Pro Rata Share**" for means the ratio of (a) the number of shares of the Company's Common Stock issued or issuable upon conversion of the shares of the Series of Preferred Stock owned by such Major Purchaser, to (b) the Fully-Diluted Share Number.

    **2.2**  **New Securities**.  "**New Securities**" means any Common Stock or Preferred Stock, whether now authorized or not, and rights, options or warrants to purchase Common Stock or Preferred Stock, and securities of any type whatsoever that are, or may become, convertible or exchangeable into Common Stock or Preferred Stock; provided, however, that "New Securities" does not include: (a) shares of Common Stock issued or issuable upon conversion of any outstanding shares of Preferred Stock; (b) shares of Common Stock or Preferred Stock issuable upon exercise of any options, warrants, or rights to purchase any securities of the Company outstanding as of the Agreement Date and any securities issuable upon the conversion thereof; (c) shares of Common Stock or Preferred Stock issued in connection with any stock split or stock dividend or recapitalization; (d) shares of Common Stock (or options, warrants or rights therefor) granted or issued after the Agreement Date to employees, officers, directors, contractors, consultants or advisers to, the Company or any subsidiary of the Company pursuant to incentive agreements, stock purchase or stock option plans, stock bonuses or awards, warrants, contracts or other arrangements that are approved by the Board; (e) shares of the Company's Financing Stock Series Preferred Stock issued pursuant to this Agreement; (f) any other shares of Common Stock or Preferred Stock (and/or options or warrants therefor) issued or issuable primarily for other than equity financing purposes and approved by the Board; and (g) shares of Common Stock issued or issuable by the Company to the public pursuant to a registration statement filed under the Securities Act.

    **2.3**  **Procedures**.  If the Company proposes to undertake an issuance of New Securities, it shall give notice to each Major Purchaser of its intention to issue New Securities (the "**Notice**"), describing the type of New Securities and the price and the general terms upon which the Company proposes to issue the New Securities.  Each Major Purchaser will have (10) days from the date of notice, to agree in writing to purchase such Major Purchaser's Pro Rata Share of such New Securities for the price and upon the general terms specified in the Notice by giving written notice to the Company and stating

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

therein the quantity of New Securities to be purchased (not to exceed such Major Purchaser's Pro Rata Share).

    **2.4**    **Failure to Exercise**. If the Major Purchasers fail to exercise in full the right of first refusal within the 10-day period, then the Company will have one hundred twenty (120) days thereafter to sell the New Securities with respect to which the Major Purchasers' rights of first refusal hereunder were not exercised, at a price and upon general terms not materially more favorable to the purchasers thereof than specified in the Company's Notice to the Major Purchasers. If the Company has not issued and sold the New Securities within the 120-day period, then the Company shall not thereafter issue or sell any New Securities without again first offering those New Securities to the Major Purchasers pursuant to this Section 2.

    **3.**    **BOARD OF DIRECTORS**. Subject to the rights of the stockholders to remove a director for cause in accordance with applicable law, during the term of this Agreement, each Stockholder shall vote (or consent pursuant to an action by written consent of the stockholders) all shares of capital stock of the Company now or hereafter directly or indirectly owned of record or beneficially by the Stockholder (the "**Voting Shares**"), or to cause the Voting Shares to be voted, in such manner as may be necessary to elect (and maintain in office) as the members of the Board the individuals designated from time to time in a writing delivered to the Company and signed by the holders of a majority of the outstanding shares of the Company's Common Stock then held by all of the Common Control Holders.

    **4.**    **GENERAL PROVISIONS**.

    **4.1**    **Successors and Assigns**. The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties to this Agreement or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement. No Stockholder may transfer Shares unless each transferee agrees to be bound by the terms of this Agreement.

    **4.2**    **Governing Law**. This Agreement is governed by the Governing Law, regardless of the laws that might otherwise govern under applicable principles of choice of law.

    **4.3**    **Counterparts; Facsimile or Electronic Signature**. This Agreement may be executed and delivered by facsimile or electronic signature and in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

    **4.4**    **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

    **4.5**    **Notices**. All notices and other communications given or made pursuant to this Agreement must be in writing and will be deemed to have been given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile or electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications must be sent to the respective parties at their address as set forth on the signature page or Schedule 1, or to such address, facsimile number or electronic mail address as subsequently modified by written notice given in accordance with this Section 4.5.

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

**4.6**    **No Finder's Fees**.  Each party severally represents to the other parties that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.  Each Purchaser shall indemnify, defend, and hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees, or representatives is responsible.  The Company shall indemnify, defend, and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

**4.7**    **Attorneys' Fees**.  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which the party may be entitled.  Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery, and performance of the Agreement; provided, however, that the Company shall, at the Closing, reimburse the fees and expenses of one counsel for Purchasers, for a flat fee equal to the Purchaser Counsel Reimbursement Amount.

**4.8**    **Amendments and Waivers** Any term of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Purchasers holding a majority of the then-outstanding shares of Financing Stock Series Preferred Stock (or Common Stock issued on conversion thereof).  It is specifically intended that entering into the Next Financing Agreements in a form substantially similar to the form agreements set as forth as Model Legal Documents on http://www.nvca.org shall be considered an amendment to this Agreement.

**4.9**    **Severability**.  The invalidity or unenforceability of any provision of this Agreement will in no way affect the validity or enforceability of any other provision.

**4.10**    **Delays or Omissions**.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, will impair any such right, power or remedy of such non-breaching or non-defaulting party nor will it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor will any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, are cumulative and not alternative.

**4.11**    **Terms that survive closing.**  All covenants, warranties and representations by Company in Section 1 of this Agreement shall survive closing and remain in place until such time that Purchaser is no longer a stockholder.

**4.12**    **Dispute Resolution**. Each party (a) hereby irrevocably and unconditionally submits to the personal jurisdiction of the Dispute Resolution Jurisdiction for the purpose of any suit, action, or other proceeding arising out of or based upon this Agreement; (b) shall not commence any suit, action or other proceeding arising out of or based upon this Agreement except in the Dispute Resolution Jurisdiction; and (c) hereby waives, and shall not assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject to the personal jurisdiction of the Dispute

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

Resolution Jurisdiction, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement, or the subject matter hereof and thereof may not be enforced in or by the Dispute Resolution Jurisdiction.

[*Remainder of Page Intentionally Left Blank*]

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first written above.

**THE COMPANY**:

*Bouxtie, Inc.*

Name:      Renato Libric

By:        *Renato Libric*
           5F18C09297164E9...

Title:     Chief Executive Officer

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first written above.

**THE PROMOTER:**

*Renato Libric*

DocuSigned by:

*Renato Libric*

5F18C08297164E9...

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first written above.

**PURCHASERS**:

*Moose Run, LLC*

Name:   David E. Lipson

By:

Title:   Managing Member

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

## <u>SCHEDULE 1</u>

### SCHEDULE OF PURCHASERS & KEY HOLDERS

**<u>PURCHASERS:</u>**

| Name, Address and E-Mail of Purchaser | Preferred Stock Shares Purchased | Indebtedness Cancellation | Cash Payment | Total Purchase Amount |
|---|---|---|---|---|
|  |  |  |  |  |

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

**KEY HOLDERS**:

*Name, Address and E-Mail of Key Holder*        *Shares of Common Stock Held*

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

Execution Copy

## BOUXTIE INC.
## NOTE PURCHASE AGREEMENT

THIS NOTE PURCHASE AGREEMENT (this "*Agreement*"), dated as of 13th of October 2017, is entered into by and among BOUXTIE INC., a Delaware corporation (the "*Company*"), and each of the undersigned purchasers (collectively the "*Purchasers*" and individually a "*Purchaser*") listed on the Schedule of Purchasers attached hereto as <u>Exhibit A</u>.

<u>RECITALS</u>

On the terms and subject to the conditions set forth herein, each Purchaser is willing to purchase from the Company and the Company is willing to sell to each Purchaser, an unsecured convertible promissory note in the principal amount set forth opposite such Purchaser's name on <u>Exhibit A</u>.

Certain other capitalized terms not defined herein shall have the meanings set forth in the form of Note (as defined below) attached hereto as <u>Exhibit B</u>.

<u>AGREEMENT</u>

NOW, THEREFORE, in consideration of the foregoing, and the representations, warranties, and conditions set forth below, the parties hereto, intending to be legally bound, hereby agree as follows:

1.      <u>The Notes</u>.

(a)      <u>Issuance of Notes</u>.  Subject to the terms and conditions of this Agreement, the Company agrees to issue, sell and deliver to each Purchaser, and each Purchaser severally agrees to purchase, an unsecured convertible promissory note in the form of <u>Exhibit B</u> attached hereto (each, a "*Note*" and, collectively, the "*Notes*") in the principal amount set forth opposite the respective Purchaser's name on <u>Exhibit A</u> hereto.

(b)      <u>Purchase Price</u>.  The purchase price payable by each Purchaser for each Note issuable hereunder (the "*Purchase Price*") is set forth opposite the name of each Purchaser on <u>Exhibit A</u>.

(c)      <u>Use of Proceeds</u>.  The Company will use the proceeds from the sale of the Notes for general corporate purposes.

2.      <u>Closing; Delivery</u>.

(a)      <u>Initial Closing</u>.  The first closing of the sale and purchase of the Notes (the "*Initial Closing*") shall take place electronically on the date first set forth above or such later date as shall be mutually acceptable to the Company and the Purchasers.

(b)      <u>Subsequent Closings</u>.  Subject to the terms and conditions of this Agreement, the Company may sell Notes at an additional closing or closings on or prior to the date that is thirty (30) days from the date hereof to such persons as the Company may determine (each



DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

a "**Subsequent Purchaser**"). Any such sale shall be made on the same terms and conditions as those contained herein, and each Subsequent Purchaser shall (i) become a party to this Agreement and (ii) have the rights and obligations of a Purchaser hereunder. The closing for the sale of Notes to such Subsequent Purchasers shall be referred to as an "**Additional Closing**." Each closing may be referred to as a Closing and collectively as the "**Closings**."

(c)     Delivery.   At each Closing, on the terms and subject to the conditions hereof, each Purchaser shall pay to the Company, by check or wire transfer of immediately available funds, such Purchaser's Purchase Price, and, in exchange for and upon receipt or confirmation of such payment, the Company will issue and deliver to each Purchaser a Note in the principal amount indicated on Exhibit A hereto.

3.     Representations and Warranties of the Company.  The Company hereby represents and warrants to each Purchaser that:

(a)     Organization and Standing: Articles and Bylaws.   The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted. The Company is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to be so qualified would have a material adverse effect on its business or properties (a "**Material Adverse Effect**").

(b)     Corporate Power.  The Company has all requisite legal and corporate power and authority to own and operate its properties and assets, to enter into, execute and deliver this Agreement and the Notes, to issue and sell the Securities (as defined below), and to carry out the provisions of this Agreement, the Notes and the Company's Certificate of Incorporation, as amended to date, filed with the Delaware Secretary of State (the "**Charter**"). This Agreement and the Notes are valid and binding obligations of the Company, enforceable in accordance with their terms, except as the same may be limited by bankruptcy, insolvency, moratorium, and other laws of general application affecting the enforcement of creditors' rights and governing specific performance, injunctive relief or other equitable remedies and general principles of equity.

(c)     Authorization.

(1)     All corporate and legal action on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Notes, the sale and issuance of the Notes and the performance of the Company's obligations hereunder and under the Notes, including the issuance and delivery of the Notes and the reservation of shares of Financing Stock issuable upon conversion of the Notes, have been taken or will be taken prior to the Closing. The shares of the Company's Financing Stock issuable upon conversion of the Notes in connection with a conversion pursuant to Section 5 of the Notes (the "**Conversion Transaction**") will be reserved for issuance upon the closing of the Conversion Transaction.

(2)     The Notes, any shares of Financing Stock issuable upon conversion or exercise of the Notes, any shares of Common Stock issuable upon conversion or exercise of the Notes, and any shares of Common Stock issuable upon conversion of such Financing Stock

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

(collectively, the "*Securities*"), when issued, sold and delivered in compliance with the provisions of this Agreement, the Notes or the terms of such Financing Stock, will be validly issued, fully paid and nonassessable and will be free of any liens or encumbrances, provided, however, that the Securities may be subject to restrictions on transfer under state and/or federal securities laws as set forth herein, and as may be required by future changes in such laws.  The issuance of the Securities will not violate or be subject to any preemptive rights, rights of first refusal and similar rights other than those that have been complied with or waived, and the Securities will be issued in compliance with all applicable federal and state securities laws.

(d)     <u>Rights of Capital Stock</u>.  The rights, preferences, privileges and restrictions of the Company's capital stock are as stated in the Charter.  The shares of the Financing Stock issuable upon conversion of the Notes will be reserved for issuance upon the closing of a Conversion Transaction.  When issued in compliance with the provisions of this Agreement, the Notes, and the Charter, such Financing Stock and Common Stock will be validly issued, fully paid and nonassessable, and will be free of any liens or encumbrances other than those created by or imposed upon the Purchasers; provided, however, that such Financing Stock and Common Stock may be subject to restrictions on transfer as set forth herein and under state and/or federal securities laws or as otherwise required by such laws at the time a transfer is proposed.

(e)     <u>Government Consent, Etc</u>.  No consent, approval, order or authorization of, or designation, registration, declaration or filing with, any federal, state, local or provincial or other governmental authority on the part of the Company is required in connection with the valid execution and delivery of this Agreement and the Notes, or the offer, sale or issuance of the Securities, or the consummation of any other transaction contemplated hereby or thereby other than (i) the filing of the Charter, and (ii) if required, filings or qualifications under U.S. federal securities laws, applicable blue sky laws or other applicable securities laws, which filings or qualifications, if required, will be timely filed or obtained by the Company.

(f)     <u>Compliance with Laws and Other Instruments; No Conflicts</u>.  The Company is not (a) in violation or default of any material provisions of its Certificate of Incorporation or Bylaws, as amended to date, (b), to its knowledge, in violation or default of any applicable laws, regulations, judgments, decrees or orders of the United States of America or any state, foreign country or other governmental body or agency having jurisdiction over the Company's business or properties or (c) in breach of or default under or, to its knowledge, alleged to be in breach of or default under, any material lease, license, contract, agreement, Debt Security, instrument or obligation to which it is a party or its properties are subject, other than, in each of (b) and (c) that would not reasonably be expected to have a material adverse effect on the business, property, financial condition or results of operations of the Company.  The execution, delivery and performance of the Agreement and the Note on the part of the Company, will not result in any such violation or default.

(g)     <u>Offering</u>.  Assuming the accuracy of the representations and warranties of the Purchasers contained in <u>Section 4</u> hereof and subject to filings pursuant to Regulation D of the Securities Act, as amended (the "*Securities Act*") and applicable state securities laws, the offer, issue, and sale of the Securities are and will be exempt from the registration and prospectus delivery requirements of the Securities Act, and have been registered or qualified (or are exempt from registration and qualification) under the registration, permit, or qualification requirements of

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

all applicable state securities laws. Neither the Company nor any agent on its behalf has solicited or will solicit any offers to sell or has offered to sell or will offer to sell all or any part of the Securities to any person or persons so as to bring the sale of such Securities by the Company within the registration provisions of the Securities Act or any state securities laws.

        (h)    No "Bad Actor" Disqualification. The Company has exercised reasonable care, in accordance with Security Exchange Commission rules and guidance, and has conducted a factual inquiry, including by the procurement of relevant questionnaires from each Covered Person (as defined below) or other means, the nature and scope of which reflect reasonable care under the relevant facts and circumstances, to determine whether any Covered Person (as defined below) is subject to any of the "bad actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act ("*Disqualification Events*"). To the Company's knowledge, no Covered Person is subject to a Disqualification Event, except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3) under the Securities Act. The Company has complied, to the extent applicable, with any disclosure obligations under Rule 506(e) under the Securities Act. "*Covered Persons*" are those persons specified in Rule 506(d)(1) under the Securities Act, including the Company; any predecessor or affiliate of the Company; any director, executive officer, other officer participating in the offering, general partner or managing member of the Company; any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power; any promoter (as defined in Rule 405 under the Securities Act) connected with the Company in any capacity at the time of the sale of the Notes; and any person that has been or will be paid (directly or indirectly) remuneration for solicitation of purchasers in connection with the sale of the Notes (a "*Solicitor*"), any general partner or managing member of any Solicitor, and any director, executive officer or other officer participating in the offering of any Solicitor or general partner or managing member of any Solicitor.

4.        Representations and Warranties by the Purchasers. Each Purchaser represents and warrants to the Company, severally and not jointly and as to itself only, as follows:

        (a)    Investment Intent: Authority. This Agreement is made with such Purchaser in reliance upon such Purchaser's representation to the Company, evidenced by such Purchaser's execution of this Agreement, that such Purchaser is acquiring the Notes for investment for such Purchaser's own account, not as nominee or agent, for investment and not with a view to, or for resale in connection with, any distribution or public offering thereof within the meaning of the Securities Act, or applicable state securities laws. Such Purchaser has the full right, power, authority and capacity to enter into and perform this Agreement and the Agreement constitutes a valid and binding obligation of such Purchaser, except as the same may be limited by bankruptcy, insolvency, moratorium, and other laws of general application affecting the enforcement of creditors' rights and general principles of equity.

        (b)    Securities Not Registered. Such Purchaser understands and acknowledges that the offering of the Notes pursuant to this Agreement will not be registered under the Securities Act or qualified under applicable state securities laws on the grounds that the offering and sale of securities contemplated by this Agreement are exempt from registration under the Securities Act and exempt from qualification or registration under applicable state securities laws, and that the Company's reliance upon such exemptions is predicated upon such Purchaser's representations set forth in this Agreement. Such Purchaser acknowledges and understands that resale of the

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

Securities may be restricted indefinitely unless the Securities are subsequently registered under the Securities Act and qualified under applicable state securities laws or an exemption from such registration and such qualification is available.

(c)     No Transfer.  Such Purchaser acknowledges that the Securities may be transferred or assigned by the Purchaser thereof in whole or in part, provided that (a) the Company shall have received a letter secured by the Purchaser from the Securities and Exchange Commission stating that no action will be recommended to the Commission with respect to the proposed disposition; (b) there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement; (c) the proposed disposition is in compliance with Rule 144 of the Securities Act; or (d) the transferor provides, at the Company's request, an opinion of counsel reasonably satisfactory to the Company that such transfer does not require registration under the Securities Act and the securities law applicable with respect to any other applicable jurisdiction. Notwithstanding the foregoing, the Securities may be transferred by a Purchaser: (i) which is a partnership to a limited, general or retired partner of such partnership; (ii) which is a limited liability company to any member or former member; (iii) to any affiliate, including affiliated funds; or (iv) to any family member or trust for the benefit of the Purchaser if the Purchaser is an individual; provided in each case that (A) the transferee agrees in writing to be subject to the terms of this Agreement and (B) the Purchaser delivers written notice of such transfer to the Company.

(d)     Knowledge and Experience.  Such Purchaser: (i) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of such Purchaser's prospective investment in the Securities; (ii) has the ability to bear the economic risks of such Purchaser's prospective investment; (iii) has had all questions which have been asked by such Purchaser satisfactorily answered by the Company; and (iv) has not been offered the Securities by any form of advertisement, article, notice or other communication published in any newspaper, magazine, or similar media or broadcast over television or radio, or any seminar or meeting whose attendees have been invited by any such media.

(e)     Access to Information.  Such Purchaser represents that it has had an opportunity to ask questions and receive answers from the Company regarding the terms of the transactions contemplated hereby, and the business, properties, prospects and financial condition of the Company.  Such Purchaser further acknowledges that it has received and reviewed all information it has deemed appropriate or necessary to enable such Purchaser to evaluate whether to enter into this Agreement and to consummate the transactions contemplated hereby.

(f)     Accredited Investor.  Such Purchaser: (i) is an "Accredited Investor" as that term is defined in Rule 501 of Regulation D promulgated under the Securities Act, and (ii) has the ability to bear the economic risks of such Purchaser's prospective investment, including a complete loss of such Purchaser's investment in the Securities.

(g)     Not Organized to Purchase.  Such Purchaser has not been organized for the purpose of purchasing the Securities.

(h)     Refusal to Transfer.  The Company need not register a transfer of the Securities, and may also instruct its transfer agent not to register the transfer of the Securities,

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

unless the transfer will satisfy the restrictions on transfer set forth in this Agreement and federal and state securities laws.

        (i)    <u>Additional Representations and Warranties of Non U.S. Persons</u>.  Each Purchaser who is a Non-U.S. person (as that term is defined below) hereby represents and warrants to the Company as follows:

        (i)    Such Purchaser is not a "U.S. Person" (as defined in Rule 902(k) under the Securities Act), which term includes individual residents of the United States, corporations or other entities organized under the laws of the United States and corporations or entities the equity holders of which are residents of the United States.

        (ii)    Such Purchaser is not acquiring the Securities for the account or benefit of any "U.S. Person," nor is such Purchaser acquiring the Securities with the intent to offer, reoffer, sell, assign, transfer, pledge, encumber or otherwise dispose of or distribute, directly or indirectly, such Securities except in accordance with Regulation S promulgated under the Securities Act, pursuant to an available exemption from registration under the Securities Act and any applicable state securities laws.

        (iii)    Such Purchaser understands and agrees that each certificate held by such Non-U.S. person representing the Financing Stock or Common Stock, or any other securities issued in respect of the Securities upon conversion thereof upon any stock split, stock dividend, recapitalization, merger, consolidation or similar event, shall bear the following legend (in addition to any legend required by this Agreement, by Sections 417 and 418 of the California Corporations Code or under applicable state securities laws):

THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "***SECURITIES ACT***"), AND MAY NOT BE SOLD, TRANSFERRED, ASSIGNED, PLEDGED OR HYPOTHECATED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S PROMULGATED UNDER THE SECURITIES ACT, PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT OR PURSUANT TO AN AVAILABLE EXEMPTION FROM REGISTRATION.  HEDGING TRANSACTIONS INVOLVING THE SHARES REPRESENTED HEREBY MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE SECURITIES ACT.  THIS CERTIFICATE MUST BE SURRENDERED TO THE COMPANY OR ITS TRANSFER AGENT AS A CONDITION PRECEDENT TO THE SALE, PLEDGE, HYPOTHECATION OR ANY OTHER TRANSFER OF ANY INTEREST IN ANY OF THE SHARES REPRESENTED BY THIS CERTIFICATE.

        (iv)    If a Purchaser is a Non-U.S. person, such Purchaser hereby represents that such Purchaser is satisfied as to the full observance of the laws of such Purchaser's jurisdiction in connection with any invitation to subscribe for the Securities or any use of the Agreements, including (a) the legal requirements within such Purchaser's jurisdiction for the

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

purchase or exchange of Securities, (b) any foreign exchange restrictions applicable to such purchase or exchange, (c) any governmental or other consents that may need to be obtained and (d) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, exchange or transfer of such securities.  Such Purchaser's subscription and payment for, and such Purchaser's continued beneficial ownership of, the Securities will not violate any applicable securities or other laws of such Purchaser's jurisdiction.

(j)     No "Bad Actor" Disqualification Events.  Neither such Purchaser nor any of its directors, executive officers, other officers that may serve as a director or officer of any company in which it invests, general partners or managing members is subject to any Disqualification Event (as defined above), except for Disqualification Events covered by Rule 506(d)(2)(ii) or (iii) under the Securities Act and disclosed in writing in reasonable detail to the Company.

5.      Conditions to Closing.

(a)     Conditions to Obligations of the Purchasers.  The obligation of each Purchaser to purchase the Notes at a Closing is subject to the fulfillment on or prior to the date of such Closing of the following conditions, any of which may be waived by that Purchaser:

(1)     The representations and warranties made by the Company in Section 3 hereof shall be true and correct on and as of the date of such Closing; and the Company shall have performed all obligations and conditions herein required to be performed or observed by the Company on or prior to the date of such Closing.

(2)     The Company shall have obtained any and all consents (including all governmental or regulatory consents, approvals or authorizations required in connection with the valid execution and delivery of this Agreement), permits and waivers necessary or appropriate for consummation of the transactions contemplated by this Agreement.

(3)     The purchase of the Notes by each Purchaser hereunder shall be legally permitted by all laws and regulations to which the Purchaser and the Company are subject.

(4)     The initial principal balance of each Note purchased by each other Purchaser purchasing Notes at such Closing shall equal or exceed $500,000.

(b)     Conditions to the Company's Obligations.  The Company's obligation to sell and issue the Notes at a Closing is subject to the fulfillment to the Company's satisfaction on or prior to the date of such Closing of the following conditions, any of which may be waived by the Company:

(1)     The representations and warranties made by each of the Purchasers in Section 4 hereof shall true and correct on and as of the date of such Closing; and the Purchasers shall have performed all obligations and conditions herein required to be performed or observed by the Purchasers on or prior to the date of such Closing.

(2)     The Company shall have obtained any and all consents (including all governmental or regulatory consents, approvals or authorizations required in connection with

7

the valid execution and delivery of this Agreement), permits and waivers necessary or appropriate for consummation of the transactions contemplated by this Agreement.

(3)     The purchase of the Notes by each Purchaser hereunder shall be legally permitted by all laws and regulations to which the Purchaser and the Company are subject.

(4)     Each Purchaser shall have delivered its respective Purchase Price to the Company.

(5)     The initial principal balance of each Note purchased by each Purchaser purchasing Notes at such Closing shall equal or exceed $500,000.

6.      Post-Close Covenant.   Other than as approved by a Majority in Interest, the Company shall not create, or authorize the creation of, or issue, or authorize the issuance of any Debt Security, or permit any subsidiary to take any such action with respect to any Debt Security. This Section 6 shall automatically terminate and be of no further force and effect upon a Conversion Transaction or upon the repayment of the Obligations (as defined in the Note).

7.      Miscellaneous.

(a)     Binding Agreement.   The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties hereto.   Nothing in this Agreement, expressed or implied, is intended to confer upon any third party any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

(b)     Waivers and Amendments.   Neither this Agreement nor the Notes, or any provision thereof, may be amended, waived, discharged or terminated orally, but only by a statement in writing.   With the written consent of those holders of not less than a majority in principal amount of the then outstanding aggregate principal amount of the Notes, the obligations of the Company and the rights of the Purchasers under this Agreement and/or the Notes may be waived (either generally or in a particular instance, either retroactively or prospectively and either for a specified period of time or indefinitely), and with the same consent the Company, when authorized by resolution of its Board of Directors, may enter into a supplementary agreement for the purpose of adding any provisions to or amending in any manner or eliminating any of the provisions of this Agreement and/or the Notes.   Any amendment or waiver affected in accordance with this Section 7(b) shall be binding upon the Company, each Purchaser and each transferee of a Note.   Notwithstanding the foregoing, no such amendment, waiver, discharge or termination shall, without the affected Purchaser's written consent, reduce (i) the principal amount of any Note or (ii) the rate of interest of any Note.

(c)     Governing Law.   This Agreement and all actions arising out of or in connection with this Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the conflicts of law provisions of the State of California or of any other state.

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

(d)     <u>Entire Agreement</u>.  This Agreement together with the exhibits attached hereto constitutes the full and entire understanding and agreement between the parties with regard to the subjects hereof and thereof.

(e)     <u>Notices, etc.</u>  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given upon the earlier of (i) when received, (ii) when delivered personally, (iii) one (1) business day after being delivered by electronic mail or facsimile (with receipt of appropriate confirmation), (iv) one (1) business day after being deposited with an overnight courier service or (v) four (4) days after being deposited in the U.S. mail, First Class with postage prepaid, and addressed to the parties at the addresses provided to the Company (which the Company agrees to disclose to the other parties upon request) or such other address as a party may request by notifying the other in writing.

(f)     <u>Expenses</u>.  Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery and performance of the Agreement.

(g)     <u>No Finder's Fees</u>.  Each party represents that it neither is nor will be obligated for any finder's or broker's fee or commission in connection with this transaction. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finders' or broker's fee (and any asserted liability) for which such Purchaser or any of its officers, partners, employees, or representatives is responsible.  The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee (and any asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

(h)     <u>Validity</u>.  If any provision of this Agreement or the Notes shall be judicially determined to be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

(i)     <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(j)     <u>Pronouns</u>.  Whenever the context may require, any pronoun includes the corresponding masculine, feminine and neuter forms.

(k)     <u>Acknowledgment; Waiver of Conflicts</u>.  Each Purchaser acknowledges that: (a) it has read the Transaction Documents; (b) it has been represented in the preparation, negotiation and execution of the Transaction Documents by legal counsel of its own choice or has voluntarily declined to seek such counsel; and (c) it understands the terms and consequences of the Transaction Documents and is fully aware of the legal and binding effect of the Transaction Documents.  Each Purchaser understands that the Company has been represented in the preparation, negotiation and execution of the Transaction Documents by DLA Piper LLP (US), counsel to the Company ("**DLA**"), and that DLA has not represented any Purchaser or any stockholder, director or employee of the Company or any Purchaser in the preparation, negotiation and execution of the Transaction Documents.  Each Purchaser acknowledges that DLA has in the past represented and is now or may in the future represent one or more Purchasers

9

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

or their affiliates in matters unrelated to the transactions contemplated by the Transaction Documents, including the representation of such Purchaser or their affiliates in matters of a nature similar to those contemplated by the Transaction Documents.  The Company and each Purchaser that DLA has represented in other matters hereby acknowledges that it has had an opportunity to ask for and has obtained information relevant to such representation, including disclosure of the reasonably foreseeable adverse consequences of such representation, and hereby waives any conflict arising out of such representation with respect to the matters contemplated by the Transaction Documents.

(l)     Counterparts.   This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together shall be deemed to constitute one instrument.  Counterparts may be delivered via facsimile, electronic mail (including pdf or any electronic signature complying with the U.S. federal ESIGN Act of 2000, e.g., www.docusign.com) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

*[Remainder of Page Intentionally Left Blank]*

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**COMPANY:**

BOUXTIE INC.

By: _Renato Libric_
_5F18C08297164E9..._

Name: Renato Libric
Title: Chief Executive Officer

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

WEST\271047612.1

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the date and year first written above.

**PURCHASER:**

*MOOSE RUN, LLC*

By: _David E. Lipson_ _____
DocuSigned by:
D01B43G8389B440.
Name: David E. Lipson
Title: Managing Member

SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

## EXHIBIT A

SCHEDULE OF PURCHASERS


Moose Run, LLC, A Wyoming limited liability company

DocuSign Envelope ID: 642B7A79-09D9-42FA-AD4B-D33790FE750E

## **EXHIBIT B**

FORM OF UNSECURED CONVERTIBLE PROMISSORY NOTE

# EXHIBIT 4

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

Execution Copy

# AGREEMENT

This Agreement is entered into on the 13th of October 2017 by and between Moose Run LLC ("Purchaser"), Bouxtie Inc. ("Company") and Renato Libric ("Promoter") in conjunction with the Note Purchase Agreement entered into on the 13th of October 2017 and the Unsecured Convertible Note entered into on the 13th of October 2017.

This Agreement supplements and supersedes to the extent there is conflict between agreements matters covered by the Note Purchase Agreement and the Unsecured Convertible Note and is being offered in order to induce Purchaser to purchase the Unsecured Convertible Note being offered pursuant to the Note Purchase Agreement.

    **1.**     **Warranties, Representations and Covenants of the Company and Promoter:** The Company and Promoter hereby represent and warrant to Purchaser that, except as set forth on the Disclosure Schedule attached as <u>Exhibit A</u> to this Agreement (the "**Disclosure Schedule**"), if any, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Agreement Date at all time thereafter, except as otherwise indicated. The representations and warranties of the Company and Promoter shall survive closing of the Unsecured Convertible Note and be in place until such time that Purchaser no longer owns its Unsecured Convertible Note or Stock in the Company.

    **1.1**     **Disclosure Schedule**. All disclosures contained in the Disclosure Schedule are true and accurate. There is no additional disclosure outside of the Disclosure Schedule.

    **1.2**     **Organization, Good Standing, Corporate Power and Qualification**. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Incorporation and has all corporate power and corporate authority required (a) to carry on its business as presently conducted and as presently proposed to be conducted and (b) to execute, deliver and perform its obligations under this Agreement. The Company is duly qualified to transact business as a foreign corporation and is in good standing under the laws of each jurisdiction in which the failure to so qualify or be in good standing would have a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, or results of operations of the Company.

    **1.3**     **Capitalization**

        1.3.1     The authorized capital of the Company consists, immediately prior to the Agreement Date (unless otherwise noted), of the following:

        (a)     The common stock of the Company (the "**Common Stock**"), of which that number of shares of Common Stock equal to (a) the Common Shares Issued and Outstanding Pre-Money are issued and outstanding as of immediately prior to the Agreement Date, (b) the number of shares of Common Stock which are issuable on conversion of shares of the Financing Stock or Preferred Stock have been reserved for issuance upon conversion of the Unsecured Convertible Note to Financing Stock as part of a Qualified Financing Transaction and (c) the Total Post-Money Shares Reserved for Option Pool have been reserved for issuance pursuant to the Stock Plan, and of such Total Post-Money Shares Reserved for Option Pool, that number of shares of Common Stock equal to the Number of Issued And Outstanding Options are currently subject to outstanding options and that number of shares of Common Stock equal to the Unallocated Post-Money Option Pool Shares remain available for future issuance to officers, directors, employees and consultants pursuant to the Stock Plan. The ratio determined by dividing (x) the Unallocated Post-Money Option Pool Shares by (y) the Fully-Diluted Share Number (as defined below) is equal to the Unallocated Post-Money Option Pool Percent. All of the outstanding shares of Common Stock are duly

**EXHIBIT 4**

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

authorized, validly issued, fully paid and nonassessable and were issued in material compliance with all applicable federal and state securities laws. The Stock Plan has been duly adopted by the Board of Directors of the Company (the "**Board**") and approved by the Company's stockholders. For purposes of this Agreement, the term "**Fully-Diluted Share Number**" shall mean that number of shares of the Company's capital stock equal to the sum of (i) all shares of the Company's capital stock (on an as-converted basis) issued and outstanding, assuming exercise or conversion of all options, warrants and other convertible securities and (ii) all shares of the Company's capital stock reserved and available for future grant under any equity incentive or similar plan.

        1.3.2    There are no outstanding preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock or Preferred Stock, except for (a) the conversion privileges of the Financing Stock Series Preferred Stock pursuant to the terms of the Restated Charter and (b) the securities and rights described in this Agreement. Nor shall any preemptive rights, options, warrants, conversion privileges or rights (including but not limited to rights of first refusal or similar rights), orally or in writing, to purchase or acquire any securities from the Company including, without limitation, any shares of Common Stock, or Preferred Stock, or any securities convertible into or exchangeable or exercisable for shares of Common Stock or Preferred Stock be issued except for those expressed in Section 1.19 of this Agreement.

        1.3.3    The Key Holders set forth in <u>Schedule 1</u> (each a "**Key Holder**") hold that number of shares of Common Stock set forth opposite each such Key Holder's name in Section 1.3.3 of the Disclosure Schedule (such shares, the "**Key Holders' Shares**") and such Key Holders' Shares are subject to vesting and/or the Company's repurchase right on the terms specified in Section 1.3.3 of the Disclosure Schedule (the "**Key Holders' Vesting Schedules**"). Except as specified in Section 1.3.3 of the Disclosure Schedule, the Key Holders do not own or have any other rights to any other securities of the Company. The Key Holders' Vesting Schedules set forth in Section 1.3.3 of the Disclosure Schedule specify for each Key Holder (i) the vesting commencement date for each issuance of shares to or options held by such Key Holder, (ii) the number of shares or options held by such Key Holder that are currently vested, (iii) the number of shares or options held by such Key Holder that remain subject to vesting and/or the Company's repurchase right and (iv) the terms and conditions, if any, under which the Key Holders' Vesting Schedules would be accelerated. Other than the Key Holders' Shares, which vest pursuant to the applicable Key Holders' Vesting Schedules, (x) all options granted and Common Stock outstanding vest as follows: twenty-five percent (25%) of the shares vest one (1) year following the vesting commencement date, with the remaining seventy-five percent (75%) vesting in equal installments over the next three (3) years and (y) no stock plan, stock purchase, stock option or other agreement or understanding between the Company and any holder of any equity securities or rights to purchase equity securities provides for acceleration or other changes in the vesting provisions or other terms of such agreement or understanding as the result of (i) termination of employment (whether actual or constructive), (ii) any merger, consolidated sale of stock or assets, change in control or any other transaction(s) by the Company, or (iii) the occurrence of any other event or combination of events.

        1.3.4    There are no outstanding warrants or options that will dilute Purchaser's percentage ownership and right to convert to common stock in the Company pursuant to the purchase documents.

        1.3.5    The Seed Series, Series A, that has been issued previous to any subsequent Financing Stock conversions being offered to purchasers or convertible note holders under subsequent financing rounds do not contain any multiplier rights, preemptive rights or rights to purchase additional

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

stock except at the price being offered to other shareholders in subsequent series or issuances at the then offered price of said series.

    **1.4**  **Conversion Rate**. Upon conversion of the Unsecured Convertible Promissory Note, the Company shall provide to Purchaser the number of shares required for Purchaser to hold a minimum of 3.99% interest in the Company.  This is separate and apart from any additional investments made by Purchaser into the Company.

    **1.5**  **Operating Documents**.  The Company's Articles and By-laws and any amendments thereof are true and accurate and have been duly authorized in all material respects.

    **1.6**  **Subsidiaries**.  The Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association, or other business entity.  The Company is not a participant in any joint venture, partnership or similar arrangement.

    **1.7**  **Authorization**.  All corporate action has been taken, or will be taken prior to the applicable Closing, on the part of the Board and stockholders that is necessary for the authorization, execution and delivery of this Agreement by the Company and the performance by the Company of the obligations to be performed by the Company as of the date hereof under this Agreement.  This Agreement, when executed and delivered by the Company, shall constitute the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

    1.7.1  Prior to closing a subsequent Qualified Financing Transaction an Amended and Restated Certificate of Incorporation shall be filed providing in part the following amendments:

      (a)  Authorizing the Issuance of Financing Stock Series Preferred Stock; and

      (b)  Authorizing the Company to grant either a Common Stock or Preferred Stock holder the right to appoint a director outside of the standard voting procedures.

    **1.8**  **Valid Issuance of Shares**.  The shares of Financing Stock Series Preferred Stock, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable state and federal securities laws and liens or encumbrances created by or imposed by a Purchaser.  Subject to filings pursuant to Regulation D of the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws, the offer, sale and issuance of the shares of Series of Preferred Stock to be issued pursuant to and in conformity with the terms of this Agreement and the issuance of the Common Stock, if any, to be issued upon conversion thereof for no additional consideration and pursuant to the Restated Charter, will be issued in compliance with all applicable federal and state securities laws.  The Common Stock issuable upon conversion of the shares Financing Stock Series Preferred Stock has been duly reserved for issuance, and upon issuance in accordance with the terms of the Restated Charter, will be duly authorized, validly issued, fully paid and nonassessable and free of restrictions on transfer other than restrictions on transfer under this Agreement, applicable federal and state securities laws and liens or encumbrances created by or imposed by a Purchaser.  Subject to filings pursuant to Regulation D of the Securities Act and applicable state

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

securities laws, the Common Stock issuable upon conversion of the shares of Financing Stock Series Preferred Stock will be issued in compliance with all applicable federal and state securities laws.

**1.9    Litigation**.  There is no pending action, suit, proceeding, arbitration, mediation, complaint, claim, charge or investigation before any court, arbitrator, mediator or governmental body or, to the Company's knowledge, currently threatened in writing (a) against the Company or (b) against any consultant, officer, director or key employee of the Company arising out of his or her consulting, employment or board relationship with the Company or that could otherwise materially impact the Company.

**1.10    Intellectual Property**.  The Company owns or possesses sufficient legal rights to all Intellectual Property (as defined below) that is necessary to the conduct of the Company's business as now conducted and as presently proposed to be conducted (the "**Company Intellectual Property**") without any violation or infringement (or in the case of third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications, without any violation or infringement known to the Company) of the rights of others.  No product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any rights to any patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, trade secrets, licenses, domain names, mask works, information and proprietary rights and processes (collectively, "**Intellectual Property**") of any other party, except that with respect to third-party patents, patent applications, trademarks, trademark applications, service marks, or service mark applications the foregoing representation is made to the Company's knowledge only.  Other than with respect to commercially available software products under standard end-user object code license agreements, there is no outstanding option, license, agreement, claim, encumbrance or shared ownership interest of any kind relating to the Company Intellectual Property, nor is the Company bound by or a party to any options, licenses or agreements of any kind with respect to the Intellectual Property of any other person. The Company has not received any written communications alleging that the Company has violated or, by conducting its business, would violate any of the Intellectual Property of any other person.

**1.11    Employee and Consultant Matters**.  Each current and former employee, consultant and officer of the Company has executed an agreement with the Company regarding confidentiality and proprietary information substantially in the form or forms made available to the Purchasers or delivered to the counsel for the Purchasers.  No current or former employee or consultant has excluded any work or invention from his or her assignment of inventions. To the Company's knowledge, no such employees or consultants is in violation thereof.  To the Company's knowledge, none of its employees is obligated under any judgment, decree, contract, covenant or agreement that would materially interfere with such employee's ability to promote the interest of the Company or that would interfere with such employee's ability to promote the interests of the Company or that would conflict with the Company's business. To the Company's knowledge, all individuals who have purchased unvested shares of the Company's Common Stock have timely filed elections under Section 83(b) of the Internal Revenue Code of 1986, as amended.

**1.12    Compliance with Other Instruments**.  The Company is not in violation or default (a) of any provisions of the Restated Charter or the Company's bylaws, (b) of any judgment, order, writ or decree of any court or governmental entity, (c) under any agreement, instrument, contract, lease, note, indenture, mortgage or purchase order to which it is a party that is required to be listed on the Disclosure Schedule, or, (d) to its knowledge, of any provision of federal or state statute, rule or regulation materially applicable to the Company.   The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated by this Agreement will not result in any such violation or default, or constitute, with or without the passage of time and giving of notice, either (i) a default under any such judgment, order, writ, decree, agreement, instrument, contract, lease, note, indenture, mortgage or

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

purchase order or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Company or the suspension, revocation, forfeiture, or nonrenewal of any material permit or license applicable to the Company.

      **1.13**   <u>**Title to Property and Assets**</u>. The Company owns its properties and assets free and clear of all mortgages, deeds of trust, liens, encumbrances and security interests except for statutory liens for the payment of current taxes that are not yet delinquent and liens, encumbrances and security interests which arise in the ordinary course of business and which do not affect material properties and assets of the Company. With respect to the property and assets it leases, the Company is in material compliance with each such lease.

      **1.14**   <u>**Agreements**</u>. Except for this Agreement, there are no agreements, understandings, instruments, contracts or proposed transactions to which the Company is a party that involve (a) obligations (contingent or otherwise) of, or payments to, the Company in excess of $50,000, (b) the license of any Intellectual Property to or from the Company other than licenses with respect to commercially available software products under standard end-user object code license agreements or standard customer terms of service and privacy policies for Internet sites, (c) the grant of rights to manufacture, produce, assemble, license, market, or sell its products to any other person, or that limit the Company's exclusive right to develop, manufacture, assemble, distribute, market or sell its products, or (d) indemnification by the Company with respect to infringements of proprietary rights other than standard customer or channel agreements (each, a "<u>**Material Agreement**</u>"). The Company is not in material breach of any Material Agreement. Each Material Agreement is in full force and effect and is enforceable by the Company in accordance with its respective terms, except as may be limited by (i) applicable bankruptcy, insolvency, reorganization or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) the effect of rules of law governing the availability of equitable remedies.

      **1.15**   <u>**Liabilities**</u>. The Company has no liabilities or obligations, contingent or otherwise, in excess of $25,000 individually or $100,000 in the aggregate.

      **1.16**   <u>**Appointment of Director**</u>. All corporate action has been taken, or will be taken prior to the applicable Closing, to appoint Dave Lipson as a director. Dave Lipson will remain a director at all times while Purchaser is either a note holder or stock holder in the Company. If Dave Lipson is unable to act as director, Purchaser will appoint a successor. Dave Lipson or his successor shall be granted a 1% common stock interest in consideration of Dave Lipson serving in an advisory role as a director to the Company fully vested at Closing of Financing Stock Series Preferred Stock. Company shall provide Director Liability Insurance in the amount of 10 million at all times during which David Lipson Serves as Director.

      **1.17**   <u>**Warrants**</u>. Purchaser shall have the right to double its investment at the 37,500,000 valuation which right shall be evidences by issuance of additional warrants or an option to purchase in favor of Purchaser upon Purchaser funding its initial investment contemplated by this Agreement. The warrants or option shall be executable for a period of 3 years from the date of initial issuance at the same valuation as the initial investment and shall be redeemable from Company Stock or if not issued by the Company from the Common Stock of owned by Promoter in the Company.

      **1.18**   <u>**Assignment of Company's Preemptive Rights**</u>. The Company shall obtain at or prior to the Initial Closing, and shall maintain, a right of first refusal with respect to transfers of shares of Common Stock by each holder thereof, subject to certain standard exceptions. If the Company elects not to exercise its right of first refusal with respect to a proposed transfer of the Company's outstanding securities by any Key Holder, the Company shall assign such right of first refusal to the Major Purchasers. In the event of such assignment, each Major Purchaser shall have a right to purchase that portion of the

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

securities proposed to be transferred by such Key Holder equal to the ratio of (a) the number of shares of the Company's Common Stock issued or issuable upon conversion of the shares of Financing Stock Series Preferred Stock owned by such Major Purchaser, to (b) the number of shares of the Company's Common Stock issued or issuable upon conversion of the shares of Financing Stock Series Preferred Stock owned by all Major Purchasers.

    **1.19**  **Reservation of Common Stock**.  The Company shall at all times reserve and keep available, solely for issuance and delivery upon the conversion of the Financing Stock Series Preferred Stock, all Common Stock issuable from time to time upon conversion of that number of shares of Financing Stock Series Preferred Stock equal to the Total Shares Authorized for Sale, regardless of whether or not all such shares have been issued at such time.

    **1.20**  **Major Purchaser**.  Purchaser is and shall be a Major Purchaser as defined in this Agreement and for purposes of this Agreement and the rights granted herein.

    **2.**   **PARTICIPATION RIGHT**.

    **2.1**  **General**.  Each Major Purchaser has the right of first refusal to purchase the Major Purchaser's Pro Rata Share of any New Securities (as defined below) that the Company may from time to time issue after the date of this Agreement, underlined provided, underlined however, the Major Purchaser will have no right to purchase any such New Securities if the Major Purchaser cannot demonstrate to the Company's reasonable satisfaction that such Major Purchaser is at the time of the proposed issuance of such New Securities an "accredited investor" as such term is defined in Regulation D under the Securities Act.  A Major Purchaser's "**Pro Rata Share**" for means the ratio of (a) the number of shares of the Company's Common Stock issued or issuable upon conversion of the shares of the Series of Preferred Stock owned by such Major Purchaser, to (b) the Fully-Diluted Share Number.

    **2.2**  **New Securities**.  "**New Securities**" means any Common Stock or Preferred Stock, whether now authorized or not, and rights, options or warrants to purchase Common Stock or Preferred Stock, and securities of any type whatsoever that are, or may become, convertible or exchangeable into Common Stock or Preferred Stock; provided, however, that "New Securities" does not include: (a) shares of Common Stock issued or issuable upon conversion of any outstanding shares of Preferred Stock; (b) shares of Common Stock or Preferred Stock issuable upon exercise of any options, warrants, or rights to purchase any securities of the Company outstanding as of the Agreement Date and any securities issuable upon the conversion thereof; (c) shares of Common Stock or Preferred Stock issued in connection with any stock split or stock dividend or recapitalization; (d) shares of Common Stock (or options, warrants or rights therefor) granted or issued after the Agreement Date to employees, officers, directors, contractors, consultants or advisers to, the Company or any subsidiary of the Company pursuant to incentive agreements, stock purchase or stock option plans, stock bonuses or awards, warrants, contracts or other arrangements that are approved by the Board; (e) shares of the Company's Financing Stock Series Preferred Stock issued pursuant to this Agreement; (f) any other shares of Common Stock or Preferred Stock (and/or options or warrants therefor) issued or issuable primarily for other than equity financing purposes and approved by the Board; and (g) shares of Common Stock issued or issuable by the Company to the public pursuant to a registration statement filed under the Securities Act.

    **2.3**  **Procedures**.  If the Company proposes to undertake an issuance of New Securities, it shall give notice to each Major Purchaser of its intention to issue New Securities (the "**Notice**"), describing the type of New Securities and the price and the general terms upon which the Company proposes to issue the New Securities.  Each Major Purchaser will have (10) days from the date of notice, to agree in writing to purchase such Major Purchaser's Pro Rata Share of such New Securities for the price and upon the general terms specified in the Notice by giving written notice to the Company and stating

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

therein the quantity of New Securities to be purchased (not to exceed such Major Purchaser's Pro Rata Share).

**2.4    Failure to Exercise**.  If the Major Purchasers fail to exercise in full the right of first refusal within the 10-day period, then the Company will have one hundred twenty (120) days thereafter to sell the New Securities with respect to which the Major Purchasers' rights of first refusal hereunder were not exercised, at a price and upon general terms not materially more favorable to the purchasers thereof than specified in the Company's Notice to the Major Purchasers.  If the Company has not issued and sold the New Securities within the 120-day period, then the Company shall not thereafter issue or sell any New Securities without again first offering those New Securities to the Major Purchasers pursuant to this Section 2.

**3.    BOARD OF DIRECTORS**.  Subject to the rights of the stockholders to remove a director for cause in accordance with applicable law, during the term of this Agreement, each Stockholder shall vote (or consent pursuant to an action by written consent of the stockholders) all shares of capital stock of the Company now or hereafter directly or indirectly owned of record or beneficially by the Stockholder (the "**Voting Shares**"), or to cause the Voting Shares to be voted, in such manner as may be necessary to elect (and maintain in office) as the members of the Board the individuals designated from time to time in a writing delivered to the Company and signed by the holders of a majority of the outstanding shares of the Company's Common Stock then held by all of the Common Control Holders.

**4.    GENERAL PROVISIONS**.

**4.1    Successors and Assigns**.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties to this Agreement or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.  No Stockholder may transfer Shares unless each transferee agrees to be bound by the terms of this Agreement.

**4.2    Governing Law**.  This Agreement is governed by the Governing Law, regardless of the laws that might otherwise govern under applicable principles of choice of law.

**4.3    Counterparts; Facsimile or Electronic Signature**.  This Agreement may be executed and delivered by facsimile or electronic signature and in two or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**4.4    Titles and Subtitles**.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**4.5    Notices**.  All notices and other communications given or made pursuant to this Agreement must be in writing and will be deemed to have been given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by facsimile or electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt.  All communications must be sent to the respective parties at their address as set forth on the signature page or Schedule 1, or to such address, facsimile number or electronic mail address as subsequently modified by written notice given in accordance with this Section 4.5.

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

**4.6**      **No Finder's Fees**.  Each party severally represents to the other parties that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction.  Each Purchaser shall indemnify, defend, and hold harmless the Company from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Purchaser or any of its officers, employees, or representatives is responsible.  The Company shall indemnify, defend, and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

**4.7**      **Attorneys' Fees**.  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of this Agreement, the prevailing party will be entitled to reasonable attorneys' fees, costs, and necessary disbursements in addition to any other relief to which the party may be entitled.  Each party shall pay all costs and expenses that it incurs with respect to the negotiation, execution, delivery, and performance of the Agreement; provided, however, that the Company shall, at the Closing, reimburse the fees and expenses of one counsel for Purchasers, for a flat fee equal to the Purchaser Counsel Reimbursement Amount.

**4.8**      **Amendments and Waivers**  Any term of this Agreement may be amended, terminated or waived (either generally or in a particular instance and either retroactively or prospectively) only with the written consent of the Company and the Purchasers holding a majority of the then-outstanding shares of Financing Stock Series Preferred Stock (or Common Stock issued on conversion thereof). It is specifically intended that entering into the Next Financing Agreements in a form substantially similar to the form agreements set as forth as Model Legal Documents on http://www.nvca.org shall be considered an amendment to this Agreement.

**4.9**      **Severability**.   The invalidity or unenforceability of any provision of this Agreement will in no way affect the validity or enforceability of any other provision.

**4.10**     **Delays or Omissions**.  No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, will impair any such right, power or remedy of such non-breaching or non-defaulting party nor will it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor will any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any party, are cumulative and not alternative.

**4.11**     **Terms that survive closing.**  All covenants, warranties and representations by Company in Section 1 of this Agreement shall survive closing and remain in place until such time that Purchaser is no longer a stockholder.

**4.12**     **Dispute Resolution**.  Each party (a) hereby irrevocably and unconditionally submits to the personal jurisdiction of the Dispute Resolution Jurisdiction for the purpose of any suit, action, or other proceeding arising out of or based upon this Agreement; (b) shall not commence any suit, action or other proceeding arising out of or based upon this Agreement except in the Dispute Resolution Jurisdiction; and (c) hereby waives, and shall not assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject to the personal jurisdiction of the Dispute

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

Resolution Jurisdiction, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement, or the subject matter hereof and thereof may not be enforced in or by the Dispute Resolution Jurisdiction.

*[Remainder of Page Intentionally Left Blank]*

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first written above.

**THE COMPANY**:

*Bouxtie, Inc.*

Name:   Renato Libric

By:     *Renato Libric*
        5F18C08297164E9...

Title:  Chief Executive Officer

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first written above.

**THE PROMOTER**:

*Renato Libric*

DocuSigned by:

Renato Libric

5F18C08297164E9...

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the date and year first written above.

**PURCHASERS:**

*Moose Run, LLC*

Name:   David E. Lipson  _____

By:   *David E. Lipson*  _____

Title:   Managing Member  _____

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

## SCHEDULE 1

### SCHEDULE OF PURCHASERS & KEY HOLDERS

#### PURCHASERS:

| Name, Address and E-Mail of Purchaser | Preferred Stock Shares Purchased | Indebtedness Cancellation | Cash Payment | Total Purchase Amount |
| --- | --- | --- | --- | --- |

DocuSign Envelope ID: 30E34424-A7D0-4DD8-9E47-B29A5C313023

**KEY HOLDERS:**

| *Name, Address and E-Mail of Key Holder* | *Shares of Common Stock Held* |
|---|---|

# EXHIBIT 5

DocuSign Envelope ID: 68408A9E-252C-4498-9EB6-D1ACEC955156

# CORPORATE RESOLUTION

## of

## BOUXTIE Inc.

BOUXTIE Inc., a Delaware corporation, on this the 13th day of October 2017, does hereby resolve that Renato Libric may enter into an Note Purchase Agreement; Unsecured Convertible Note; Stock Option Agreement and all other documents necessary to complete the transaction with Moose Run, LLC.   Said transaction shall allow for the Moose Run, LLC to lend Bouxtie Inc. $1,500,000 at an interest rate of 3.5% and allow for the Note to convert to shares equaling no less than 3.99% of the Company at the time of conversion.

Approved by:

Bouxtie Inc.

I further certify that this Corporation is duly organized and existing, and has the power to take the action called for by the foregoing resolution.

DIRECTORS

DocuSigned by:

Atjit Joy

5F18C08297184E9...

DocuSigned by:

Bernard Pursnick

5F18C08297164E9...

DocuSigned by:

Juan Wu

5F18C08297184E9...

DocuSigned by:

Robert May

5F18C08297104E9...

**EXHBIT 5**

# EXHIBIT 6

DocuSign Envelope ID: 43EC71CE-8320-4F1F-A311-8EE624954630



~SEE REVERSE SIDE FOR RESTRICTIVE LEGENDS~

# BOUXTIE INC

A DELAWARE CORPORATION

NUMBER PS-27

*947,059* SHARES

This Certifies that **Moose Run LLC**, is the record holder of **Nine Hundred Forty Seven Thousands and Fifty Nine (947,059)** shares of Series B Preferred Stock of Bouxtie Inc., a Delaware corporation (the "Corporation"), transferable only on the books of the Corporation by the holder, in person, or by duly authorized attorney, upon surrender of this certificate properly endorsed or assigned.

This certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Certificate of Incorporation and the Bylaws of the Corporation and any amendments thereto, copies of which are on file at the office of the Corporation, and made a part hereof as fully as though the provisions of said Certificate of Incorporation and Bylaws were imprinted in full on this certificate, to all of which the holder of this certificate, by acceptance hereof, assents and agrees to be bound. The shares represented by this certificate are subject to the legend(s) affixed to the back of this certificate.

A statement of all of the rights, preferences, privileges and restrictions granted to or imposed upon the respective classes and/or series of shares of stock of the Corporation and upon the holders thereof may be obtained by any stockholder upon request and without charge, at the principal office of the Corporation, and the Corporation will furnish any stockholder, upon request and without charge, a copy of such statement.

The shares represented by this certificate are deemed issued effective **December 4th 2017.**

IN WITNESS WHEREOF, the Corporation has caused this Certificate to be signed by its duly authorized officers as of December 4th 2017.

DocuSigned by:

*Renato Libric*
5F48C036979HE9...
RENATO LIBRIC, SECRETARY

DocuSigned by:

*Renato Libric*
5F48C036979HE9...
RENATO LIBRIC, CEO

EXHIBIT 6

DocuSign Envelope ID: 43EC71CE-8320-4F1F-A311-8EE62495463 0

FOR VALUE RECEIVED **$1,500,000** HEREBY SELLS, ASSIGNS AND TRANSFERS UNTO **MOOSE RUN LLC 947,059 SHARES** REPRESENTED BY THE WITHIN CERTIFICATE AND DOES HEREBY IRREVOCABLY CONSTITUTE AND APPOINT DLL PIPER ATTORNEY TO TRANSFER THE SAID SHARES ON THE SHARE REGISTER OF THE WITHIN NAMED CORPORATION WITH FULL POWER OF SUBSTITUTION IN THE PREMISES.

DATED December 4th 2017 SIGNATURE

DocuSigned by:
Renato Ghini
5F18C9829714AE9...

**NOTICE: THE SIGNATURE ON THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THIS CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE WHATSOEVER.**

THE SHARES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO TRANSFER MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM REASONABLY SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933, AS AMENDED.